**REICH et al. v. VEGEX, Inc.**

**No. 1711.**

District Court, E. D. Pennsylvania.

Oct. 27, 1942.

Abraham L. Shapiro, of Philadelphia, Pa., for plaintiffs.

R. Sturgis Ingersoll, of Philadelphia, Pa., for defendant.

WELSH, District Judge.

In this action the plaintiffs seek specific performance of an alleged oral contract under which the plaintiffs and defendant were to join in the establishment and operation of a plant for drying and debittering brewers' yeast for human consumption. The plaintiffs claim damages for breach of the contract by the defendant, measured by the loss of prospective profits, or in the alternative, the value of their services on a quantum meruit. After presentation of their proofs, plaintiffs moved to amend the complaint to conform to the testimony, and the defendant moved for the dismissal of the bill of complaint on the pleadings and the evidence. Defendant withdrew its objections to the amendments and argument was had only upon the motion to dismiss the bill. The matter is therefore before the Court upon the question of the sufficiency of the ex parte evidence to establish the plaintiffs' claim.

The evidence consists of the testimony of the plaintiffs and their counsel, and certain documents, letters and forms of agreement pertaining to the joint venture. No written agreement was ever adopted and executed by the parties. In substance the plaintiffs' evidence establishes the following matters:

In 1939 the plaintiff Ganellin, having made a survey of the yeast business throughout the country, proposed to Allen, president of the defendant company, a plan for drying and debittering yeast at low cost, and stated that he was looking for an associate to provide funds necessary for the establishment of a plant. In May, 1940, he again discussed the proposal with Mr. Allen and Mr. Timmer, vice president of the defendant, at which time the general proposal and estimated cost were discussed. A conference was also had in June, 1940 in which Allen stated that he was authorized by his company to negotiate an agreement, and Ganellin further outlined his proposal. At that point the proposal contemplated that a separate corporation be organized for the manufacture and sale of dried and debittered yeast and that the defendant should get its own yeast supply from the new company at cost plus a royalty payable to Ganellin. The royalty was to be 2¢ per pound on at least 1,000 pounds per day

for the first year and on 2,000 pounds per day in the second year of operation. It was intended that all of the money necessary to establish the business would be advanced by the defendant and repaid out of profits, and it was also understood that Ganellin would seek a location, source of yeast supply, and necessary machinery, and that he would supervise the new business when established.

On July 10, 1940, Allen and Timmer, officers of the defendant, come to Philadelphia with the plaintiff Ganellin by train. At the station they were met by the plaintiff Reich who had been described by Ganellin as an expert on the drying and debittering of yeast. The party visited a brewery where they examined and approved the proposed yeast supply. They then inspected a plant that had been selected by the plaintiffs as a place of operation and which met with the approval of the defendant's officers. At a luncheon meeting following these inspections, the plaintiffs state that Allen and Timmer agreed to having Reich join in the enterprise and to his receiving 25% of the stock of the proposed corporation and 2¢ per pound royalty on the minimum yeast requirements of the defendant, and to a like share and royalty to Ganellin. Defendant was to own the remaining 50% interest. The amount required to establish the business was stated to be about $25,000, an inactive corporation subsidiary of the defendant would be used as the operating company, and it was agreed that Reich should be in charge of the operations and assist Ganellin in sales promotion. Plaintiffs testified that after the meal and discussion, Allen declared "It is agreeable, it is a deal." "I am glad we arrived at an agreement. Now do your best and you will get my full cooperation." "I will make a transcript of the terms of the agreement we have arrived at so that there may be no misunderstanding."

Plaintiffs' description of the alleged agreement was partly corroborated by Timmer who acknowledged the understanding that a separate corporation would be set up for the new venture, the name of the defendant's inactive subsidiary might be used, Ganellin and Reich were to have an interest therein, and 2¢ per pound royalty would be paid to each of the plaintiffs. Mr. Allen also on cross examination confirmed the fact that use of the defendant's inactive subsidiary, and Ganellin's desire for 50%

interest were discussed, and that defendant was willing to pay 4¢ per pound royalties.

Following the luncheon meeting, Allen on July 15 prepared and submitted to the plaintiffs an initialed memorandum which begins: "One of the important things in the matter of yeast drying in Philadelphia is a basis of arrangement between Mr. M. C. Ganellin, Mr. J. S. Reich and Vegex, Incorporated. The following suggestions were made for Mr. Ganellin and Mr. Reich to work on and perfect" followed by certain specifications with regard to the directors of the proposed corporation, execution of a lease, quantity and sale of yeast to be produced and ending with the sentence, "The point is to work out what everybody will consider to start with is a fair thing so that we can go into it with teamwork."

Plaintiffs declare that the memorandum did not constitute a transcript of the oral agreement arrived at on July 10, 1940, and was at variance with the understanding of the parties. They complained to Allen of the inadequacy of the memorandum but were lulled into a sense of security by his assurance that he would prepare a proper agreement and also by Timmer's statement that they could rely upon Allen to perform his obligations.

The testimony indicates that following the luncheon meeting, the plaintiffs arranged for the leasing of a plant and negotiated with the brewery for the yeast supply. They also located machinery and equipment and attended to the installation, although the contract for the purchase of the yeast, the lease and all purchases were made by the defendant. Ganellin was in the defendant's New York office frequently and consulted with Allen and Timmer throughout the progress of the enterprise, while Reich looked after the establishment of the plant. Allen and Timmer also came to Philadelphia on several occasions and cooperated with the plaintiffs in the project. During this period both plaintiffs worked toward the realization of the joint enterprise and the defendant expended $23,000 in the process. Many problems were presented and decided during this period although no mutual effort was ever made to set down in writing the complete understanding of the parties until November 1, 1940. During that time it was apparent that substantial differences existed between them. On September 20, 1940, the defendant wrote Reich acknowledging that he had been on the job of equipment installation for four weeks and tendering him compensation. The same day defendant wrote Ganellin suggesting continuation of their talks which Ganellin indicated had to do with the terms upon which the yeast venture was proceeding. Defendant again wrote Reich on September 27, 1940, concerning details and stating that "The next step is what relations.·ip there may be with you and Mr. Ganellin since we have assumed the purchases of yeast, steam,· electricity and employment, should be decided upon and soon" and suggesting a meeting. In the latter part of October Ganellin submitted an outline of a proposed new agreement with the view to resolving the differences between the parties, which outline states "As a compromise I (Ganellin) propose the following new agreement to supercede the original agreement" followed by a brief statement of the terms suggested and a description of the benefits to be derived. On October 28, 1940, the defendant wrote to the plaintiffs suggesting a conference and mentioning the fact that a majority of the defendant's directors had previously ratified the "tentative agreement" which had been the basis of their joint venture, and asking whether either of the parties had been in any trouble with the Internal Revenue Department.

On November 1, 1940, the plaintiffs and Mr. Wernick, acting as friend of the plaintiffs rather than as counsel, met with Allen and Timmer at the office of the defendant corporation in New York. Morton, a ·director and counsel for the defendant corporation, was also present. The purpose of the conference was to adjust the differences existing between the parties with the view to entering into a written agreement. The relationship of the parties in the venture, their interests and all of the essential terms under which they proposed to operate were discussed and, according to the plaintiffs' version, were definitely agreed upon. At the close of the conference, it was understood that the defendant's officers would draft and submit an agreement embodying the oral understandings. Such draft was prepared by Morton and sent to the plaintiffs on November 6, 1940, with a letter in which Allen declared "I do hope that as few changes as possible will be suggested", and discussing in some detail several of the terms contained in the draft. On the same day Allen wrote to the plaintiff Reich stating that "With the agreement which was unanimously reached with you, Mr. Ganellin, Mr. Wernick, Mr. Morton, Mr. Timmer

and myself present as to the 220,000 pounds there should be no reason that while the rest of the agreement is being worked out, you should not take charge of the plant."

The plaintiffs, however, did not deem that the draft submitted conformed to the oral understanding reached in the conference on November 1, 1940, and a further meeting was held at Mr. Wernick's office on November 16, 1940, at which time he acted as counsel for the plaintiffs. The meeting was attended by Ganellin, Reich, Allen and Timmer. With the Morton draft before them, they proceeded to a discussion of the details of their arrangement and notations were made upon the draft of changes deemed essential. After several hours of conference, the plaintiffs declare that a definite oral agreement was reached on all essential terms and that all parties agreed that Mr. Wernick should set down in a written contract the terms adopted by the parties at that meeting. Before leaving, Mr. Allen directed Mr. Wernick to have the plaintiffs sign the draft and to send it to the defendant corporation for execution. Thereafter Mr. Wernick prepared an agreement, had it signed by the plaintiffs, and sent to the defendant on November 20, 1940. Allen acknowledged receipt of what he termed the "proposed agreement" and indicated an intention to "get together with the final terms of the contract to be submitted and formally ratified by the board of directors", and further suggesting the necessity of clearing up the matter of the acceptability of the personnel including the plaintiffs. On November 23, 1940, Allen wrote to the plaintiffs' counsel advising that as soon as Morton returned, "your draft of the contract will be turned over to him with a rather extensive and I hope, fair statement of facts since Mr. Ganellin contacted us. There are several open questions which we must get to and settle." This was followed by a letter from Morton to the plaintiffs' counsel declaring that his form of agreement expressed the understanding of the parties at the meeting of November 1, 1940, and protesting that the Wernick draft was distinctly at variance with the agreement reached at that meeting. Wernick replied on December 2, 1940, offering justification of his draft as a statement of the agreement entered into on November 16, 1940, and suggesting a further conference of the parties to adjust any differences which they believed might exist. On November 29, 1940, the defendant wrote to the plaintiffs suspending operations at the Philadelphia plant until a final definite agreement had been reached, and on December 10 again wrote plaintiffs that no final agreement had been reached and that the changes in the Wernick draft submitted were not acceptable. Mr. Wernick replied that he considered defendant's letter constituted an attempted breach of the oral contract. There was further correspondence but it appears that no agreement was ever consummated. Reich reported to and sought to perform services at the plant up until February 1, 1941, at which time he was denied access to the premises.

An attempt was made to operate the plant in November but did not succeed because a drum cracked almost immediately. There was a long delay in replacing the part and the plant never did get into operation for the drying and debittering of yeast. It was finally sold by the defendant about a year later together with other assets at a valuation fixed by the defendant of $15,000.

The defendant urges that these facts and circumstances describe only the negotiations between parties with the view to establishing a jointly owned business enterprise, and that they do not set forth a complete definite and fixed agreement (Edgcomb v. Clough, 275 Pa. 90, 118 A. 610) such as would be required to entitle the plaintiffs to the redress claimed. In the testimony of Allen given on cross examination, he declared that only the high spots of the proposed relationship and business were discussed and that no definite agreement was reached. As to the luncheon conference, he said "We had a very wide discussion; we discussed the plan of getting together what Ganellin and I had talked about in New York * * *. We were not entering into anything. We were discussing the proposed terms of an agreement." He described his subsequent memorandum of July 15, 1940, as an effort to fence off the matters to be considered in the formation of an agreement, and confirms the plaintiffs' testimony as to the efforts made to reach a final agreement on November 1 and 16, 1940.

In order to grant the relief demanded, it is necessary to find from all of the circumstances that there was a binding agreement of the parties made on July 10, 1940, based upon a meeting of the minds of the parties on the essential terms and with the serious intention to be bound thereby.

Plaintiffs claim that their services were rendered in pursuance of that contract and that their rights to shares in the business and to prospective profits therefrom, except as such rights may have been modified by the subsequent oral agreements made on November 1 and 16, 1940. It is essential therefore to determine from the evidence whether a legally enforceable contract resulted from the luncheon conference, and the existence or non-existence of such contract must be determined from the language used and all of the facts and circumstances which might indicate whether or not a meeting of the minds had actually been accomplished.

 Viewed in the light of common experience, it would seem that the whole picture is one of extensive and continuing negotiations on the promotion of a joint venture which was never finally consummated, in spite of the fact that both parties worked hopefully toward the accomplishment of the project in the belief that a mutually satisfactory agreement could and would be reached. It is not to be expected nor is it essential that all of the details involved in the founding of a commercial manufacturing plant be definitely fixed before the parties become bound. It is necessary, however, that they agree upon the essential terms and seriously understand and intend the agreement to be binding upon them. Such understandings and intentions are evidenced by the works and by the actions of the parties. Several factors in this case indicate the propriety of the conclusion that the parties were merely negotiating and that they were not contractually bound to the joint project.

It may even be conceded that plaintiffs and defendant's officers substantially agreed upon a plan of promotion and operation. It is not clear, however, that they entered into and became bound by any legally adequate agreement. The negotiations began in the spring of 1939 and by July 10, 1940, the general scheme and objectives of the project had been discussed by Ganellin and Allen on several occasions but no definite plan or agreement had been reached. On that day additional elements and terms were proposed and discussed including the acceptance of Reich into the enterprise. A plan for the promotion of the project appears to have been agreed upon but at the same time it was understood that a written agreement would be prepared embodying the terms upon which they would proceed.

Allen indicates his impression of the conference by declaring that they were discussing a proposed agreement but were not then entering into any legal contract. Later he prepared a memorandum which outlined certain objectives and problems to be worked out. It was not in any sense an agreement, and on the contrary, quite definitely indicates that his mind had not met with the plaintiffs' on any certain and final terms. In spite of the fact that the memo was at variance with plaintiffs' understanding of the basis upon which they were proceeding, and inherently indicated that no certain agreement had been reached, they nevertheless continued with the joint project in the hope and expectation that a satisfactory written agreement would eventually be consummated. Throughout the promotion the parties were in frequent contact and were cooperating in the furtherance of the plan. There is further confirmation of the impression that no agreement was reached found in the correspondence and in the fact that differences arose between the parties, and finally led to a serious effort to negotiate a contract in November. There was Ganellin's written outline or offer to compromise the terms of what he referred to as the original contract, but which it seems might more accurately be designated as the original plan arrived at in the earlier negotiations. This was followed by conferences on November 1 and 16, 1940, at which terms were agreed upon orally with the understanding that they would be set forth in writing. Approval and adoption of those terms would normally be indicated by execution of the contract but they were never signed and, of course, are not the contracts on which this suit is based.

We may concede that Mr. Wernick's recital of what transpired at those conferences is entirely accurate, but it does not seem logical or necessary, in our view of the circumstances, to adopt his conclusion that definite and binding oral contracts resulted. Those conversations and agreements were said to be modifications of the alleged oral agreement of July 10, 1940, of which Mr. Wernick had no knowledge other than the reports given to him by his clients. It is undoubtedly true that many points of agreement were reached, and it is quite possible that the general plan of establishing the plant was agreed to and adopted and that the minds of the parties then met upon many of the essential terms. It is another thing to conclude and there-

fore find that such agreements constituted binding and enforceable contracts which obligate defendant to their terms in the face of the evidence disputed. In any event they were not the agreement under which the plaintiffs had performed services and upon which their rights are necessarily based, nor do they confirm the existence of any such prior contract. Very pertinent questions were raised with regard to the acceptability of the plaintiffs by the Treasury Department, the possible depletion of vitamin factors, warranties and representations of the parties and the advisability of an arbitration clause. All of these circumstances indicate quite clearly the absence of any definite enforceable contract based upon mutual acceptance of obligations.

■ Preliminary negotiations leading up to the formation of a contract must be distinguished from the contract itself, and proof of the contract must be certain and explicit at least on all essentials. "An arrangement of terms, in contemplation of a written contract, is not a perfect agreement upon which an action can be maintained. To produce this effect, it must be shown, by the acts or declarations of the parties, that they intended the agreement to be operative before execution, and without regard to the writing." Maitland v. Wilcox, 17 Pa. 231.

In the present case the negotiations and writings between the promoters and the defendant, the call of meetings to get together on an agreement, the continuing discussions as to terms, the two formal but unacceptable drafts, and the furtherance of the project by the plaintiffs after being advised on July 15, 1940, of Allen's state of mind, are convincing proof that the acts and declarations of the parties had not accomplished a meeting of the minds on July 10, 1940. They were no more than incomplete understandings looking to the creation of an express agreement. "It is not unusual for persons to agree to negotiate with the view of entering into contractual relations and to reach an accord at once as to certain major items of the proposed contract and then later find that on other details they cannot agree. In such a case no contract results." Upsal Street Realty Co. v. Rubin, 326 Pa. 327, 192 A. 481, 483. There may have been an agreement on certain points such as the use of defendant's corporation, shares of ownership, and the amount of royalties, but it is obvious that there was no agreement on other important points and that the acts and declarations of the parties throughout indicated they were continuing their efforts to reach and execute a written agreement before they would mutually become obligated in the joint venture.

■ As to the claim for damages on the quantum meruit basis, that also is dependent upon the establishment of an oral contract which was breached, or upon proof that the plaintiffs rendered services to the defendant. It is found that no oral contract was established. It is found also that the services were rendered not at the instance and request of the defendant for its purposes, but they were rendered in pursuance of the desire and efforts of both parties to promote and operate a joint business enterprise in which each party would have his interest and receive his share of the returns. It cannot be presumed from these circumstances that the defendant company sought and requested the services of the plaintiffs for the accomplishment of its own purposes and that an implied contract resulted. The law will not presume or imply a contract except in cases where it is necessary to do so in order to prevent an undue hardship or injury upon one of the parties. "A party who relies upon a contract must prove its existence; and this he does not do by merely proving a set of circumstances that can be accounted for by another relation appearing to exist between the parties." Hertzog v. Hertzog, 29 Pa. 465. The plaintiffs have expressly stated that the relationship between the parties was not a contractual relationship of employment, nor were services rendered at the request of the defendant. It was a joint venture in which both parties were functioning toward a final determination of the desired relationship, and it is therefore accounted as a relationship other than one based upon an implied contract.

The record does not prove the existence of an enforceable contract between the parties nor does it establish facts from which a contract must be implied, and it would seem that there is no basis upon which the Court might find any sum due to the plaintiffs by the defendant.

■ Those cases in which compensation may be allowed on a quantum meruit appear to be based upon contracts which are indefinite, uncertain, void or unenforceable, but not illegal in themselves, and by virtue of which a quasi-contractual obligation is

incurred by the defendant because of services rendered to him in pursuance thereof. Kisinger v. Pennsylvania Trust Co. of Pittsburgh, 119 Pa.Super. 16, 180 A. 79; Blair Engineering Co. v. Page Street & Wire Co., 3 Cir., 288 F. 662. In the present case we have not found any actual agreement to exist, but are bound to conclude that the agreement if any was upon the plan, and probably some of the terms, of a proposed joint venture instituted for their mutual benefit and at their joint risk and from which neither party benefitted upon its collapse. The failure of the joint venture was obviously a disastrous disappointment to both parties and it seems equitable to permit the loss to fall upon them to the extent of their respective time, efforts and investments.

The amendments to the bill of complaint are allowed but the bill as amended is not supported by adequate proofs and is therefore dismissed.