# Beliron Construction Co. *v.* Potomac Insurance Company, Appellant.

380

Argued June 18, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Edwin B. Barnett,* with him *Strong, Barnett, Hayes & Quinn,* for appellant.

*M. Stuart Goldin,* with him *Isenberg, Goldin & Blumberg,* for appellee.

OPINION BY CERCONE, J., September 23, 1974:

This appeal arises from the plaintiff's judgment, after a jury trial, on its assumpsit claim below. The plaintiff, Beliron Construction Co. (Beliron), maintained that through its agent, Mr. Griffiths, it had orally entered into a special multiple-peril (SMP) insurance policy with the defendant, Potomac Insurance Co. (Potomac); and, that the policy provided for a $50,000 payment as the result of the fire that leveled Beliron's newly purchased fabricating plant on June 4, 1967. Potomac argues, *inter alia,* that the evidence of such an

agreement was insufficient to support the verdict, and that the lower court erred in denying Potomac's motions for a directed verdict or a judgment non obstante veredicto. The complex facts of the case may be condensed as follows:

On May 12, 1967, Belmont Iron Works, a conglomerate controlled by Mr. Raymond Perelman, entered into an agreement to purchase the assets of a small company called Kennedy Fabricating and Machine Co. (Kennedy) which at that time was insolvent. (Belmont later assigned its interest to its subsidiary, Beliron.) The agreement provided that Beliron would acquire all the assets and assume all the liabilities of the seller and pay it $30,000. Part of the liabilities of the company were arrearages related to insurance policies which Kennedy had established with Potomac through Potomac's agent George Brown.

When Kennedy entered into the insurance agreements in December, 1966, because of its tenuous financial position, it also entered into a financing agreement with First Pennsylvania Bank. According to the financing agreement, the bank would pay the full year's premium on the insurance policies in advance, and Kennedy would repay the bank in ten monthly installments of $188.70, such payments to be due on the thirtieth day of each month commencing in January and concluding in October, 1967. At the time of the purchase and sale contract with Beliron, Kennedy had made none of those required payments. The bank had frequently threatened to exercise its right to cancel the policy and receive in refund the unearned premiums from the insurance company. However, the bank did not do so chiefly because of the efforts of Brown, agent of Potomac who apparently had guaranteed Kennedy's obligation under the financing contract and, therefore, could ultimately be responsible for the bank's losses due to Kennedy's default.

Brown knew of the impending sale of the Kennedy plant and hoped not only that Beliron would make good the Kennedy arrearages, but continue the policy and its concomitant financing agreement with First National. On May 18, 1967, Brown met with William Griffiths, a vice president of Belmont in charge of the Kennedy acquisition, and discussed the future insurance of the plant. It is from this conversation that the alleged oral insurance agreement purportedly arose. During this conversation Brown informed Griffiths of Kennedy's total debt with regard to Kennedy's various insurance policies, including: $943.50 in unpaid installments from January 30 through May 30, 1967; $487.68 owed to Brown for a 1966 Workmen's Compensation audit he had performed; and $4.00 for an automobile insurance audit for Kennedy's personal car. The total due, including the May 30th payment, was $1,435.36.

On May 23, 1967, Beliron, successor to Belmont, mailed a check for that amount to Brown, who received it on May 26th. Brown then forwarded the bank's portion of that payment, retained what was owed to him and ordered that the Kennedy policy be cancelled. The Kennedy-Beliron closing, originally scheduled for June 1, 1967, took place on May 26th, and fire destroyed the plant nine days later.

The following is the plaintiff's version of, and its only testimony concerning, the May 18th conversation between Griffiths and Brown. The emphasis throughout has been editorially provided.

"Q. Would you recall as fully as you can, and tell His Honor and the members of the jury just what that conversation was between you and Mr. Brown? A. Yes. I asked Mr. Brown what policies he had that covered the Kennedy property. He had a sort of notation—he didn't have any policies with him, but he did read off certain values that were covered in the area of Workmen's Compensation, fire and other types of insurance

that he carried.[1]  I told him that we were in the process of buying the Kennedy Fabricating Company, that the settlement date would be June the first or sooner, and if it were sooner, I would let him know.  *I told him that I wanted to keep these policies current,* that at the time that he came in there, they were in arrears, but that Bob Kennedy informed me there was some sort of bank loan arrangement to pay for the policies, that he had not paid the bank for about two or three, maybe four months.  I told Mr. Brown that *I would like to keep these current,* and what was the bank charge or how much money did we have to pay him *to bring the policies up to date, to keep them in force* until such time as I told him we no longer wanted him or somebody else would inform him."

On cross-examination, Griffiths further testified: "Q. What else did you talk about?  A. [W]hen he asked if I thought they would keep him as broker of record, I told him I really couldn't guarantee such a thing as that, because *they had other brokers in other areas, but might maintain the policies that were in existence until they expired.*  Q. Is that your recollection of what he asked?  A. Yes.  Q. Is that because you had told him you wanted coverage up to the settlement date?  A. No. *I told him I wanted to keep the policies that the Kennedys had in force* until such time as he was notified that we no longer wanted them."

Further, during cross-examination concerning the maintenance of Kennedy's workmen's compensation insurance Griffiths testified: "A. I didn't know how they handled insurance on that type of coverage.  *It might be more economical to keep the current policy on rather than cancel and write a new policy.*  Q. You were asked by Mr. Perelman to look into it.  Now, if Kennedy had

---

[1] The other types of insurance included two automobile insurance policies on personal cars owned by the Kennedys, and a homeowners policy covering the Kennedy home.

---

Workmen's Compensation for its employees, that does not have anything to do with the Workmen's Compensation for Belmont employees, does it? A. Of course not. Q. Of course not? A. Right. Q. So why would Belmont be interested in keeping Kennedy's Workmen's Compensation policy in effect? A. Well, very simply. I think the fact that *we are talking about a period of eight to ten days,* and Mr. Perelman asked me to keep the policies in force, we are not talking about that much money. *It is a lot easier to keep a viable thing going and change it later when it becomes more opportune.* Q. Keep it in effect until settlement? A. *Keep all of them in effect until settlement, at which time the name would be changed to Beliron and keep all policies in force until we told him otherwise."*

The testimony of the plaintiff's sole witness concerning this material conversation clearly indicates that, at most, an assignment of the Kennedy policies to Beliron was intended.[2] However, Beliron iterated and reiterated at trial that its theory was not assignment,[3] and insisted that the jury only be instructed to consider whether the conversation of Brown and Griffiths constituted a *new* contract incorporating by reference the terms and conditions of the Kennedy policy.[4] There is

---

[2] Brown's testimony, which provided a more credible explanation of the actions of the parties, indicated that Griffiths told him to bring the policies up to date, but that after settlement Beliron would insure the plant through one of the brokers it had previously retained on other insurance matters. At the time of the instant suit, Beliron had already filed suit against another broker for negligently failing to provide insurance on the plant.

[3] Beliron even objected when Potomac suggested that the jury be informed that an assignment could not be found. The court agreed with the plaintiff and refused to give that instruction. Had the court indicated to the jury that it should differentiate between an assignment and a new contract, the jury may have reached the proper verdict in this case.

[4] The plaintiff apparently reasoned that the assignment theory would be futile because Kennedy was not part of the agreement,

no language in the testimony which indicates that a new agreement was intended. Indeed, the plaintiff nowhere indicates how First National was a party to this "new contract" which manifestly contemplated the payment of monthly installments as they were paid under the Kennedy arrangement.

Even if we determined that Griffiths, Vice-President of Belmont, actually intended to enter into a new contract of insurance, we cannot find the language used by Griffiths apt for that purpose. The controlling factor in determining the intention of the parties is their manifestations of mutual assent.[5] The controlling meaning is "that meaning which the one making the manifestations in question should reasonably have anticipated would be attributed to them by the other party."[6] Under the facts of this case, Griffiths of Belmont could not have reasonably anticipated that Brown would interpret his manifestations as indicating that a new contract was contemplated, nor could any reasonable jury. Therefore, the lower court erred in denying the defendant's motion for a judgment n.o.v., insofar as the plaintiff proffered no evidence which indicated that the parties contemplated the formation of a new contract of insurance.

Judgment of the lower court is reversed.

PRICE, J., dissents.

---

and because the policy itself required that all assignments of the policy be approved by Potomac *in writing*.

[5] Restatement of Contracts, 2d §19 & Comment c (1973); Restatement of Contracts §20 (1932).

[6] Grismore on Contracts §95 (Murray ed. 1965).