The MARTHA COMPANY, d/b/a the
Hilton Inn, et al., Plaintiffs,

v.

NATIONWIDE MUTUAL INSURANCE
COMPANY, Defendant.

Civ. No. 77–920.

United States District Court,
M. D. Pennsylvania.

June 26, 1979.

As Amended Sept. 18, 1979.

Stephen A. Cozen, Cozen, Begier & O'Connor, Philadelphia, Pa., for plaintiffs.

G. Thomas Miller, David E. Lehman, McNees, Wallace & Nurick, Harrisburg, Pa., for defendant.

## OPINION

MUIR, District Judge.

### I. Introduction.

The Plaintiffs in the above-captioned case, the Martha Company, Inc., Robert Quinlan, Trustee in Bankruptcy, Fidelco Growth Investors, and the Mutual Fire Marine & Inland Insurance Co., filed this action against Nationwide Mutual Insurance Co. seeking recovery of the proceeds of a fire policy issued by Nationwide on the Hilton Inn in Scranton, Pennsylvania which was destroyed by fire. Nationwide alleges that it cancelled the policy prior to the fire. The matter was tried to the Court from April 24 to April 30, 1979. The following represent the Court's findings of fact, discussion, and conclusions of law.

### II. Findings of Fact.

1. The Martha Company, Inc., is a Pennsylvania corporation with its principal place of business located at 225–231 Washington Avenue, Scranton, Pennsylvania. (Undisputed), hereafter (U)

2. At all pertinent times the Martha Company was the owner of the building and contents thereof forming a portion of the aforesaid premises wherein it conducted a hotel and restaurant business under the name "Hilton Inn." (U)

3. The owner of the real estate forming a portion of such premises was, at all pertinent times, Fidelco Growth Investors (Fidelco). (U)

4. Fidelco is a business trust existing under the laws of the Commonwealth of Pennsylvania with offices located at 1200 East Lancaster Avenue, Rosemont, Pennsylvania. (U)

5. The first mortgage to such premises (both building and land) was held by Jefferson Standard Life Insurance Company (Jefferson Standard). (U)

6. At all pertinent times Fidelco leased the real estate forming a portion of such premises to the Martha Company and Fidelco held a second or wrap-around mortgage with respect to the building and contents forming portions of such premises. (U)

7. Fidelco handled the collection of mortgage payments both for itself and for Jefferson Standard. (U)

8. Nationwide Mutual Fire Insurance Company (Nationwide) is an Ohio corporation with its principal place of business located at 246 North High Street, Columbus, Ohio. (U)

9. On or about August 21, 1974, Nationwide issued to the Martha Company a policy of insurance bearing No. 58SM–12600 (Ex. P–1).

10. The term of the Nationwide policy period was from August 10, 1974 to August 10, 1977.

11. The Nationwide policy was a special multi-peril policy (SMP) providing coverage *inter alia,* for damages resulting from accidental fire.

12. Coverage for workmen's compensation was issued at the same time under the identifying policy Number 58WC–12600 by Nationwide Mutual Insurance Company and for billing purposes the policies were treated as a unit and referred to as "the Nationwide policy."

13. The Nationwide policy provided, *inter alia,* the following coverages or limits of liability with respect to fire loss:

    (a) Building—$3,000,000.00

    (b) Personal Property—$600,000.00

    (c) Loss of Gross Earnings—$300,000.00

    (d) Loss of rentals—$115,000.00.

14. The interests of Fidelco and Jefferson Standard were recognized under the Nationwide policy as named mortgagees. (U)

15. The annual premium for coverage under the Nationwide policies (both SMP and WC) was to be paid· by the Martha Company on an installment basis, commonly referred to as a "ten-pay" plan.

16. Under this ten-pay plan an initial deposit was made at the inception date of the policy and on each anniversary date, with nine additional premium payments in the ensuing months. (U)

17. As the Nationwide policy had an inception date of August 10, 1974, under the "ten-pay" plan premium installments were not ordinarily due by the Martha Company during the months of June and July of each year, the premium having been fully paid with the May premium installment. (U)

18. The terms, conditions and limits of coverage under the Nationwide SMP policy are as set forth in Exhibit P–1. (U)

19. The Nationwide policy was placed by the Martha Company through Gwilym Maddock. (U)

20. At all pertinent times Mr. Maddock was an authorized agent of Nationwide. (U)

21. Pursuant to the Agent's Agreement entered between Mr. Maddock and Nationwide on or about August 1, 1975, Mr. Maddock agreed exclusively to represent Nationwide in the sales and service of insurance policies, with the sole exception of the placement of insurance under the Pennsylvania Fair Plan, Assigned Risk Pool, and other state or federal insurance plans. (P–3) (U)

22. Pursuant to the Agent's Agreement entered between Mr. Maddock and Nationwide, Mr. Maddock was authorized to bind policies of insurance.

23. Pursuant to the Agent's Agreement entered between Mr. Maddock and Nationwide, Mr. Maddock was authorized to accept premiums from insureds. (U)

24. Pursuant to the aforesaid Agent's Agreement, Mr. Maddock had the right to "exercise independent judgment as to time, place and manner of soliciting insurance, servicing policyholders, and otherwise carrying out the provisions of this agreement." (U)

25. As an agent of Nationwide, Mr. Maddock was encouraged to "conserve" policies by maintaining contacts with insureds

and advising them of overdue premiums which he was authorized to receive.

26. Mr. Maddock's compensation as an agent for Nationwide was dependent, in part, upon the continuation of coverage under policies of insurance solicited by Mr. Maddock. (U)

27. On or about January 28, 1975, Nationwide sent a letter to the Martha Company advising the latter that Martha Company's check had been returned by its bank because of insufficient funds and further advising of the cancellation of the subject policy if a premium installment in the amount of $977.00 were not received by Nationwide within 10 days of the receipt by Martha Company of such letter as to the Nationwide Mutual Fire Insurance Coverage and that the workmen's compensation coverage would be cancelled effective February 12, 1975. (Ex. P–4)

28. On or about February 18, 1975, approximately six days after the purported cancellation date established by Nationwide pursuant to its letter of January 28, 1975, Martha Company's draft in the amount of $977.00 was cleared by the Administrative Accounting Office of Nationwide which had responsibility with respect to insufficient funds, checks and the coverage was continued.

29. On May 9, 1975 Nationwide sent to Martha Company a letter advising it that Martha's check for $1117.00 had been returned by Martha's bank because of insufficient funds and that cancellation would be effective May 24, 1975 unless the premium was paid. (P–6)

30. Prior to May 24, 1975, Nationwide officials in the regional office at Harrisburg received a telephone call reporting that payment by certified check had been delivered to Maddock, Nationwide's agent. Cancellation was not processed on that occasion, payment having been made prior to the cancellation date.

31. On or shortly after September 30, 1975, Nationwide issued a premium notice to Martha Company indicating a payment due October 10, 1975 in the amount of $2,624, representing installments for September and October, 1975.

32. On November 4, 1975, Martha Company issued two checks in the amount of $1,312 each, payable to Nationwide and tendered them to agent Maddock in payment of the premium notice referred to in the foregoing paragraph.

33. Mr. Maddock on November 5, 1975 transmitted the checks totalling $2,624 to Nationwide.

34. The said checks from Martha Company dated November 4, 1975 were returned for insufficient funds.

35. No premium notice was sent by Nationwide to Martha Company in November or December, 1975, because of the pending "bad checks."

36. On December 11, 1975, agent Maddock received and transmitted to Nationwide a check in the amount of $2626, in payment of the checks referred to in paragraphs 32 and 34 above, which had been returned for insufficient funds plus $1.00 for each bad check.

37. On or about January 2, 1976, Nationwide sent its premium notice to Martha Company in the amount of $3,936, due January 10, 1976, for installments for November, December, 1975 and January, 1976.

38. On January 12, 1976, Nationwide sent to Martha Company an audit premium billing, in the amount of $2,841. This billing, which was due to be paid within 25 days, was not part of the normal installment billing under the 10-pay plan, but represented an adjustment for workmen's compensation purposes in the premium for the first policy year, based on audit of the insured's business operations.

39. Within a few days after January 10, 1976, Nationwide sent notice of cancellation to Martha Company, advising it that coverage would be cancelled on the 22nd day following the due date of the premium referred to in paragraph 37 above, the installment premium billing due January 10, 1976.

40. On January 27, 1976, the Martha Company delivered payment in the amount of $1,312 to agent Maddock who transmitted the same on that date to Nationwide.

41. Nationwide did not process cancellation of the policy at the end of January, 1976, although only part of the premium billed and due January 10, 1976 had been received.

42. Nationwide did not advise Mr. Maddock that he had acted beyond his authority as an agent in accepting and tendering to Nationwide the partial payment of $1,312.00.

43. On February 9, 1976, Nationwide sent a notice to Martha Company that the audit premium of $2,841 was past due and that the coverages would be cancelled. A cancellation as of 12:01 A.M. on February 24, 1976 was specifically identified with respect to the Nationwide workmen's compensation policy and a cancellation date 10 days after receipt of the letter was sent for the fire policy.

44. On February 24, 1976, agent Maddock received payment in the sum of $2,841 and transmitted the same to Nationwide.

45. On February 25, 1976, Mr. Maddock advised Nationwide of the receipt of the premium payment of $2,841.00 from the Martha Company. (U)

46. On March 1, 1976, Nationwide's billing office received from its agent, Mr. Maddock, the premium payment of $2,841.00. (U)

47. Nationwide continued coverage under the subject policy upon receiving the aforesaid premium payment of $2,841.00 after the time but on the same date established by Nationwide for the cancellation of the subject workmen's compensation policy.

48. Nationwide did not advise Mr. Maddock that the acceptance and transmittal of the premium of $2,841.00 after the cancellation time but on the cancellation date exceeded his authority as an authorized agent of Nationwide.

49. On or about February 4, 1976, an installment premium notice was sent to Martha Company by Nationwide calling for payment due February 10, 1976, in the amount of $4,457.

50. No cancellation notice was sent with respect to the February installment premium due February 10, 1976 since a cancellation notice identified in ¶ 43 above, was already outstanding to the policyholder.

51. On or about March 17, 1976, Nationwide sent to Martha Company an installment premium notice calling for payment of $8,465 due April 10, 1976. No payment was received by Nationwide in response to that premium notice.

52. In the normal course, a cancellation notice should have been released to Martha Company by the commercial accounts billing department of Nationwide on or about April 15, 1976. However, the cancellation notice form was inadvertently misfiled in the tickler system under an incorrect date. Accordingly no cancellation notice was sent with respect to the April, 1976 installment premium.

53. On March 1, 1976, Barry Jones, Commercial Lines Underwriter, and Donald Bowman, his supervisor in the underwriting department of Nationwide, determined that Nationwide wanted to get off and stay off the account and that if the Martha Company failed thereafter to pay a premium when due, Nationwide would cancel and would not reinstate the policy for Martha Company.

54. No one at Nationwide communicated the decision in the preceding paragraph to Mr. Maddock or to Martha Company prior to May 28, 1976.

55. On April 23, 1976, Nationwide sent its installment premium notice dated April 21, 1976 to Martha Company, bearing a due date of May 10, 1976 and calling for payment of $10,469.

56. The premium notice dated April 21, 1976 included the balance due from the installment premium notice due January 10, 1976, referred to in paragraph 37 above, which balance was $2,624, the February 10, 1976 installment in the amount of $1,312, installments due March 10, April 10, and May 10, 1976 each in the amount of $2,004, plus an increased amount required on account of estimated workmen's compensation payroll amounting to $521.

57. On April 2, 1976, the Martha Company filed a Petition for Arrangement under Chapter XI of the Bankruptcy Act, in the United States District Court for the Middle District of Pennsylvania, docketed to No. BK–76–412. (U)

58. Attached to the said Petition as Schedule B was a list of the accounts payable of the Martha Company, which list set forth Nationwide Insurance as an account payable and reflected the amount of $10,463. (U)

59. $10,463 was the amount shown as the "new balance" on the installment premium notice referred to in paragraph 55 above, sent to the Martha Company on or about March 17, 1976.

60. Nationwide did not receive any payment with respect to the April 21, 1976 premium installment bill prior to May 10, 1976. (U)

61. On or about May 14, 1976, Nationwide sent a notice of cancellation to the Martha Company, setting a cancellation date of June 1, 1976. (U)

62. The foregoing cancellation notice was received by George Carros, President of the Martha Company, in normal course. (U)

63. Upon receiving the aforesaid cancellation notice, Mr. Carros called Nationwide's agent, Mr. Maddock, and requested that a meeting be held in an attempt to come to some arrangement as to the payment of any outstanding premiums.

64. Prior to the May, 1976 premium billing, Mr. Carros had not been directly involved in receipt of insurance premium billings or payment of premiums.

65. Prior to March or April, 1976, premium billings and payment matters had been handled for Martha Company by Gerald Swift who left Martha Company in February or March, 1976.

66. On or about May 21, 1976, agent Maddock stopped at the Hilton Hotel and inquired of Mr. Carros as to payment of the premium. (U)

67. On May 24, 1976, Mr. Maddock called again at the Hilton Hotel and Mr. Carros gave him a check for $2,004, stating that he could pay the balance of the premium during July and August, 1976, and asked whether that would be acceptable to Nationwide. Mr. Maddock replied that they had had those problems in the past and that they had always been arranged, (Carros dep. December 8, 1978, pp. 10, 11, and 12) but Mr. Maddock did not agree to make the arrangement and did not assure Mr. Carros that Nationwide would accept Mr. Carros's proposal.

68. Mr. Carros told Mr. Maddock to come back the following Monday to pick up a further payment.

69. At the time of his conversation with Mr. Maddock, Mr. Carros was not aware of the specific prior problems in premium payments.

70. Mr. Maddock transmitted the check for $2,004 to Nationwide together with his copy of the cancellation notice on May 24, 1976. (U)

71. Nationwide received, accepted and deposited the $2,004 check and gave Mr. Maddock credit therefor in calculating his earned commissions.

72. Nationwide had an internal policy of accepting late payments up to five days beyond the "cancellation" date where the premium payments were small because of delays in the mail but the premium payments in this case exceeded the upper limits of that practice.

73. On Friday, May 28, 1976 Nationwide sent a letter to the Martha Company over the signature of Barry Jones, Commercial Lines Underwriter, which read as follows: "The total premium notice of $10,469 was due on May 10, 1976. Since only full payments are acceptable, we cannot continue your coverage. Therefore, the prior notice of cancellation effective June 1, 1976 stands."

74. The information contained in the May 28, 1976 letter was never communicated to Mr. Maddock orally prior to June 1, 1976 nor to the insured.

75. Mr. Carros received the letter of May 28, 1976 in normal course on or after June 1, 1976, Monday, May 31, 1976 having been a federal holiday.

76. Upon receiving the letter of May 28, 1976 Mr. Carros called Mr. Maddock and inquired as to whether anything could be done. Mr. Maddock indicated he did not know whether anything could be done and that he would get in touch with Nationwide.

77. Mr. Maddock immediately called the Nationwide regional office in Harrisburg and spoke to Messrs. Jones and Meabon in the underwriting department.

78. Mr. Maddock was advised by the underwriting department representatives that Nationwide was standing on its notice of cancellation and would not reinstate the policy and that he should not accept any further payments from the Martha Company.

79. Mr. Maddock immediately called Mr. Carros back and told him that the policy would not be reinstated by Nationwide. Mr. Carros then asked Mr. Maddock if he could help in placing the insurance coverage with another company and Mr. Maddock said he would see what he could do.

80. Neither Mr. Carros nor any other representative of the Martha Company agreed that the attempted cancellation of the Nationwide policy as of June 1, 1976 was an effective cancellation.

81. As part of its general conditions, the Nationwide policy provided:

"This policy may be cancelled at any time by this company by giving to the insured a five days' written notice of cancellation with or without tender of the excess of paid premium above the pro rata premium for the expired time, which excess, if not tendered, shall be refunded on demand. Notice of cancellation shall state that said excess premium (if not tendered) will be refunded on demand."

(U)

82. Paragraph D of Part A of the Policy Provisions extended the five days written notice mentioned in the preceding paragraph to 10 days.

83. At no time prior to June 1, 1976 did Mr. Maddock advise Martha Company or Mr. Carros that he was not authorized to accept partial payment of premiums or late payments.

84. At no time prior to June 1, 1976 did Mr. Maddock advise Martha Company or Mr. Carros of *any* limitations on his authority.

85. Mr. Maddock had received no rules, regulations or manuals which specifically delineated his authority with respect to acceptance of late or partial premiums and continuation of coverage.

86. By letters dated June 15, 1976, Nationwide sent notice to the first and wrap-around mortgagees, Jefferson Standard and Fidelco, that their respective interests in the insurance policy were cancelled on the tenth day after receipt by them of the letter(s).

87. The said notices of cancellation to the mortgagees were received by Fidelco on June 18, 1976 and by Jefferson Standard on or about June 20, 1976.

88. On June 22, 1976, Fidelco's representative C. Armel Nutter, Jr., called Fidelco's counsel and directed him to advise Martha's counsel to pay the premiums or to secure other insurance coverage.

89. On June 24, 1976, Fidelco's representative, C. Armel Nutter, Jr., spoke to Donald Bowman of Nationwide's underwriting department who advised him that Nationwide had received a series of bad checks under a 10-pay plan and because of a series of circumstances almost ten months had gone by before a cancellation notice had been issued, and that the Martha Company had indicated a willingness to pay the back premiums if the policy were reinstated but that Nationwide had decided that it would lose the premiums if necessary and would not reinstate the policy.

90. On June 25, 1976, Russell J. O'Malley, Esq. filed an application for a temporary restraining order with the Bankruptcy Court in Scranton to enjoin Nationwide from "cancelling its policy." (U)

91. On June 25, 1976, Mr. O'Malley wrote to Nationwide enclosing a copy of the application and temporary restraining order and stating "We have been advised that you are cancelling your multi-peril policy No. 58–SM–106–533 . . . ."

92. Nationwide's reconstructed office copy of the policy shows No. 58–SM–106–533 struck out and 58–SM–12600 substituted.

93. In the application for temporary restraining order, over the signatures of both Mr. Carros and Mr. O'Malley, the Martha Company averred that:

"Nationwide has given written notice to debtor that said policy will be cancelled and has given notice to Jefferson Standard Life Insurance Company . . . that said policy as to its interest therein will be cancelled effective July 1, 1976, and to Fidelco Growth Investors . . that said policy will be cancelled as to its interest therein effective June 28, 1976."

94. The temporary restraining order was issued in the form submitted by Martha Company on June 25, 1976. (U)

95. A supplemental restraining order was issued by the Court on June 29, 1976, fixing a hearing for July 16, 1976. (U)

96. On July 6, 1976, Nationwide filed a motion to dissolve both the temporary and supplemental restraining orders. (U)

97. In its application for a restraining order, Martha Company did not aver that the Nationwide cancellation notice was defective or ineffectual in any respect.

98. In its motion to dissolve, Nationwide averred, *inter alia,* that the subject policy had been duly, lawfully and effectively cancelled for nonpayment of premium as of June 1, 1976. Nationwide prayed for dissolution of the orders "retroactively to their date of issuance." (U)

99. On July 10, 1976, Fidelco obtained a binder effective the same date, from Mutual Fire, Marine and Inland Insurance Company (Mutual Fire), covering the Hilton Inn premises in Scranton. (U)

100. Mutual Fire is a Pennsylvania corporation with its principal place of business located at 1200 Three Parkway, Philadelphia, Pennsylvania. (U)

101. The Mutual Fire policy was obtained and paid for by Fidelco on the assumption that the Nationwide policy had been cancelled.

102. The Nationwide policy and the Mutual Fire policy insured the same insureds (Martha Company, Jefferson Standard Life Insurance Company, and Fidelco) as their interests may appear.

103. The Mutual Fire policy contained limits of liability with respect to the building of $3,000,000 and with respect to personal property of $600,000. (P–18)

104. On July 13, 1976, the Martha Company informed the Bankruptcy Court that the motion of Nationwide to dissolve the restraining orders would not be contested, that the debtor reserved all rights, if any, it may have had against the enjoined party, and the Court ordered that the motion to dissolve be granted accordingly.

105. At the time such restraining orders were dissolved Mr. Carros and the attorney for the Martha Company were not aware that other coverage had been obtained on behalf of the Martha Company by Fidelco through Mutual Fire.

106. Effective July 1, 1976, the Martha Company and its Twin Grill and Interstate Restaurant secured workmen's compensation coverage through American Mutual Insurance Company of Reading, Pennsylvania. (U)

107. On July 14, 1976, C. Armel Nutter, Jr. representing Fidelco, wrote to Jefferson Standard advising them of the Advice of Insurance "which we have arranged on the captioned property since the previous insurance policy was cancelled by Nationwide Insurance Company." (U)

108. On August 13, 1976, Mr. Nutter wrote again to Jefferson Standard Life Insurance forwarding the original insurance policy issued by Mutual Fire and referring to the said policy as "the replacement insurance policy on the captioned property." (U)

109. On July 13, 1976, after the dissolution of the restraining order, Mr. Carros for the Martha Company approached an insurance agent named Harvey C. Clauss in Scranton, requesting his help in securing insurance for the Martha Company premises. (U)

110. Mr. Carros signed an application to the insurance placement facility for insurance coverage on the Hilton Inn under the Pennsylvania Fair Plan. On the application form where the question appeared "Other insurance in force" Mr. Carros indicated "None." (U)

111. The first year of advance premium in the amount of $12,000 was secured 25% from Mr. Carros and 75% borrowed from a local bank with the guarantee of Mr. Clauss. Mr. Clauss delivered the forms to Mr. Carros to be carried immediately to Philadelphia for delivery to the insurance placement facility. (U)

112. Within the next day or two Mr. Clauss learned that the mortgagee had secured other insurance coverage. Mr. Clauss then called the insurance placement facility and withdrew the application and had the advance premium check returned.

113. On and before June 1, 1976, Barry Jones of the Nationwide Underwriting Department was unaware that bankruptcy proceedings involving Martha Company were pending.

114. No amounts were paid to Nationwide by or on behalf of the Martha Company after the payment of $2,004.00 received on May 24, 1976 by Mr. Maddock.

115. The premium for the coverage furnished by Nationwide for the policy beginning August 10, 1975 and continuing through to the date of cancellation June 1, 1976 is calculated by prorating the annual premium over the number of days for which coverage was furnished in the policy year.

116. The premium earned by Nationwide for the coverage as furnished to Martha Company between August 10, 1975 and June 1, 1976 was $16,044.00.

117. The total sums paid by Martha Company on account of the premium due to Nationwide, including the last payment of $2,004.00, amounted to $9,955.00.

118. Nationwide received no monies from or on behalf of Martha Company which represented excess premium or unearned premium for coverage under the Nationwide policy.

119. Following cancellation of the policy, the balance due Nationwide from Martha Company on account of premium earned while the policy was in effect and prior to its cancellation June 1, 1976, was $6,089.00.

120. At no time did Mr. Carros or any other representative of the Martha Company or Fidelco surrender the Nationwide policy to Nationwide. (U)

121. On September 13, 1976, the Martha Company was adjudicated bankrupt. (U)

122. On October 1, 1976, Robert Quinlan was appointed Trustee of the Martha Company. (U)

123. Robert Quinlan is a citizen and resident of Pennsylvania. (U)

124. On October 9, 1976, an accidental fire substantially damaged and destroyed the Hilton Inn located at 225–231 Washington Avenue, Scranton, Pennsylvania. (U)

125. Appropriate notice of the loss and resulting claim was given by Martha Company and Fidelco to Mutual Fire and Nationwide. (U)

126. Nationwide rejected the claim on the *sole* ground that cancellation by direct notice had been effected as of June 1, 1976. (P–24)

127. Nationwide was invited to participate with Mutual Fire in the adjustment of the fire loss. (U)

128. Nationwide refused to participate in the adjustment of the fire loss. (U)

129. Young Adjustment Company of Philadelphia was retained by the Martha Company and its trustee to assist in the preparation of an insurance claim to be submitted to Mutual Fire and Nationwide. (U)

130. Mutual Fire retained William E. Miller & Son of Bala Cynwyd, Pennsylvania to assist it in the adjustment of the fire loss. (U)

131. After extensive negotiations between the adjusters representing Mutual Fire and Martha Company the following losses were agreed to:

(a) Building _____ $2,086,642.00

(b) Personal Property _____ 463,358.00

(c) Temporary Shoring and Salvage Expenses _____ 81,820.00

TOTAL          $2,631,820.00

(U)

132. The reasonableness of this settlement was approved by Judge Thomas Gibbons of the Bankruptcy Court on February 3, 1978. (U)

133. The settled loss in the amount of $2,631,820.00 was fair and reasonable.

134. The Martha Company sustained a loss of rentals in the amount of $100,979.28 and a loss by reason of business interruption in the amount of $208,330.

135. Mutual Fire paid the full loss into the Bankruptcy Court in the amount of $2,631,820.00 which would be compensable under the Nationwide policy if it were in full force and effect on October 9, 1976.

136. A co-insurance penalty in the amount of $137,950 with respect to the building loss is applicable based upon the amount of the settlement referred to in ¶ 131 because the Nationwide policy was not in effect at the time of the fire loss.

137. Mutual Fire, Martha Company, and Fidelco agreed to add back a co-insurance penalty in the amount of $121,802 as a means of reaching agreeable loss figures with respect to the building and personal property damages.

138. The question of whether Martha Company was subject to a coinsurance penalty affected the settlement between Martha Company and Mutual Fire but the settlement statement made no allocation with respect to a coinsurance penalty.

139. The amount of monetary impact on the settlement between Martha Company and Mutual Fire cannot be ascertained with reasonable accuracy.

140. On or about April 20, 1978, the trustee of the Martha Company, Fidelco and Mutual Fire, entered into a release and loan receipt pertaining to the payment by Mutual Fire of the sum of $2,631,820 in settlement of all claims against Mutual Fire arising from the fire occurring on October 9, 1976.

141. Based on his appraisal of the value of the building and contents, Mr. Carros believed that insurance coverage limits of $3,000,000 and $600,000 respectively, were adequate.

142. Neither business interruption nor loss of rentals coverage was furnished under the Mutual Fire policy.

### III. Discussion.

The basic issue to be decided in this case is whether the fire insurance policy issued by Nationwide on August 21, 1974 insuring the Hilton Inn in Scranton, Pennsylvania, against loss by reason of fire from August 10, 1974 through August 10, 1977 was in effect on October 9, 1976, the date on which fire substantially destroyed the hotel. It is the Plaintiff's position that the policy was in effect and that the Plaintiffs are entitled (1) to compensation for business interruption and loss of rents which were compensable under the Nationwide Policy but not under the policy obtained by the second mortgagee, Fidelco Growth Investors, from the Mutual Fire Inland & Marine Insurance Co., (2) a co-insurance penalty which was assessed by Mutual Fire against the Martha Company because of underinsurance on the premises which allegedly would not have been assessed had the Nationwide policy been in effect, and (3) an amount equal to half of what was paid by Mutual Fire to the Martha Company representing Nationwide's pro rata share of the compensable damage to building and property. Nationwide contends that the policy was cancelled as to the Martha Company effective June 1, 1976 and that effective notices of cancella-

tion were sent to both the first and second mortgagees so that the policy was not in effect on October 9, 1976.

In support of their position, the Plaintiffs assert (1) that the notice of cancellation which was sent to the Martha Company and which purportedly cancelled the policy effective June 1, 1976 did not comply with the formal requirements for a notice of cancellation and therefore did not serve to terminate insurance coverage, (2) that even if the notice of cancellation was valid, Nationwide's agent, Gwilym Maddock, agreed with the President of the Martha Company prior to the date of cancellation that the policy would continue in force if the Martha Company made a partial payment of the premium then due and remitted the balance of the premium to Nationwide during June and July of 1976 and, finally, (3) that because Nationwide accepted partial and late payments from the Martha Company prior to the date of cancellation, Nationwide waived its right to cancel the policy based upon failure to pay the entire premium on the date that it was due. Nationwide takes the opposite position with respect to each of the Plaintiffs' arguments and, in addition, asserts that the obtaining of the Mutual Fire policy by Fidelco represented a cancellation by substitution. Because the Court concludes that the policy was not in effect on October 9, 1976 since it was cancelled with respect to the Martha Company on June 1, 1976 by virtue of a proper notice of cancellation, there was no agreement reinstating or continuing the policy past that date and no waiver on Nationwide's part with respect to late or partial payments, the Court will not reach Nationwide's argument relating to cancellation by substitution.

First, the Plaintiffs assert that the cancellation notice sent to the Martha Company on or about May 14, 1976 was not a proper notice of cancellation. Under Pennsylvania law, the conditions of cancellation set forth in a fire insurance policy must be strictly complied with should the insurer decide to cancel the policy. The cancellation notice must be written and must be a positive and unequivocal statement of cancellation indicating unmistakably to the insured an intention on the part of the insurer that it will no longer be bound under the policy after the effective cancellation date. *See Pomerantz v. Mutual Fire Ins. Co.,* 279 Pa. 497, 124 A. 139 (1924). In *Pomerantz,* the Court found a purported notice of cancellation defective because the notice merely requested the insured to return his insurance policy to the company for purposes of cancellation but did not indicate unequivocally that cancellation would take effect at a certain time. The Plaintiffs assert that although the cancellation notice sent to them on or about May 14, 1976 was unequivocal on its face in that it indicated that because of the failure to pay a premium coverage would be terminated effective 12:01 a. m. on June 1, 1976 the conditions on the back of the notice stating *inter alia,* that cancellation would not become effective if the insured paid the premium prior to the cancellation date listed on the front, made the notice conditional rather than unequivocal. However, the Court is not convinced that the conditions on the back of Nationwide's cancellation notice render the notice conditional rather than unequivocal. The notice is not phrased in the form "If you do not pay your premium this policy will be cancelled." Rather, it indicates affirmatively that the insurer has made a decision not to continue coverage but provides the insured with an opportunity to prevent cancellation by prompt action on his part in paying the overdue premium. It is the view of the Court that the notice sent by Nationwide was sufficient to indicate to a person of reasonable understanding that his insurance coverage would cease at a certain date. Therefore, the notice met the requirements of Pennsylvania law.

The Plaintiffs' next contention, and the most crucial issue in this case, is that Nationwide's Scranton agent, Gwilym Maddock, agreed with George Carros, the President of Martha Company, in late May of 1976 that the Nationwide fire policy would continue in effect so long as a portion of the outstanding premium was paid by the Martha Company and the balance

paid in June and July of 1976, two months during which payments of premium ordinarily would not be payable under the 10-month installment payment plan for payment of the annual premium. The fire insurance policy had an anniversary date of August 10, and was issued under a "10-pay" plan, by which the Martha Company, had it paid all installments when due, would have made a deposit on August 10 of a particular policy year and remitted the balance in nine equal monthly installments so that for the last two months of the policy year no premiums would be due. The Plaintiffs rely heavily upon the testimony of Mr. Carros, whose deposition was taken prior to the trial of this case and who died prior to the trial. Were the Court wholly to believe Mr. Carros's testimony and wholly to disbelieve Mr. Maddock's testimony with regard to what words were exchanged between the two following Mr. Carros's receipt of the notice of cancellation, the Court is not convinced that the Plaintiffs would have met their burden of demonstrating that an oral agreement including the terms described above had been reached between the parties. However, this Court has carefully considered both the testimony of Mr. Maddock and Mr. Carros and finds as a fact that when Mr. Carros inquired of Mr. Maddock as to what could be done about the cancellation and whether an agreement relating to a partial payment in May of 1976 followed by payment of the balance of the overdue premium in June and July of 1976 could be made, Mr. Maddock responded that there had been difficulties with the payment of premiums in the past but that an agreement had always been reached before. There was no commitment by Maddock to bind Nationwide to continue coverage. The Court specifically finds Mr. Maddock to be credible based upon his demeanor while testifying and upon other factors including his lack of actual authority to bind Nationwide to a policy in excess of $600,000 and based also on his previous conduct, which generally consisted of accepting either a late payment, a partial payment, or a second payment from the Martha Company where a check remitted to Nationwide had been re-

turned for insufficient funds. The most that Mr. Maddock did was imply a hope that Nationwide would continue the policy in effect without making any specific guarantees to anyone at the Martha Company that coverage would continue. The legal effect of Mr. Maddock's statement that things similar to what Mr. Carros suggested had been arranged in the past did not bind Nationwide to the arrangement proposed by Mr. Carros. In determining whether an agreement had been reached between parties, the controlling factor in determining their intentions relates to outward manifestations, including the words spoken. See *Beliron Construction Co. v. Potomac Ins. Co.*, 230 Pa.Super. 379, 326 A.2d 499 (1974). Consent by both parties to the specific terms of the contract is essential to the formation of such an agreement. See *Shipley v. Pittsburgh & L.E.R. Co.*, 83 F.Supp. 722, 750 (W.D.Pa.1949); *Reich v. Vegex, Inc.*, 51 F.Supp. 99 (E.D.Pa.1942), aff'd 137 F.2d 647 (3d Cir. 1943). Mr. Maddock's words were in the form of reassurances given to Mr. Carros that there had been problems in the past and that things would probably be worked out. However, Mr. Maddock did not state that he agreed to a rescission of the cancellation notice or that he agreed to keep the policy in effect, and he did not agree to any specific payment terms suggested by Mr. Carros. Rather, after assuring Mr. Carros in the manner described above, he took the check for $2,004.00 which represented a partial payment of the premium due and remitted the check along with his copy of the cancellation notice to Nationwide. About March 1, 1976, however, Nationwide's underwriters had agreed between themselves that the Martha Company was a bad risk and that if there were a future cancellation for non-payment of premiums, the policy would not be reinstated. Mr. Maddock was so informed following Nationwide's receipt of the partial payment and his copy of the cancellation notice. Based upon the words exchanged between Mr. Carros and Mr. Maddock in May of 1976, this Court concludes that there was no agreement reached which would invalidate Nationwide's otherwise proper cancellation notice.

The final argument advanced by the Plaintiffs is that because of Nationwide's conduct in the past with respect to either late or partial payments it waived its right to insist upon either prompt or full payment of premiums and that the tender of a partial payment by the Martha Company should have been accepted and should have served to continue the policy in effect notwithstanding the cancellation notice. The Court finds, however, that Nationwide's conduct with respect to the acceptance of either late or partial payments during the life of this policy was limited to two instances. The first relates to the January, 1976 billing for premiums for the months of November, December, and January. The Martha Company paid one-third of the premium and no notice of cancellation was sent nor did Nationwide indicate that partial payment of a premium would not be accepted. With respect to the late payment, a $2,841.00 audit premium on the workmen's compensation policy was accepted late by Nationwide on February 24, 1976. However, the notice of cancellation indicated that coverage would be terminated at 12:01 a. m. on February 24, 1976. A check for the full amount of the premium was received by Nationwide's agent, Mr. Maddock, on February 24, 1976 and remitted to Nationwide the following day. It is the view of the Court that these two isolated instances do not amount to a course of conduct which would lead a reasonable person to assume that Nationwide would not insist upon prompt payment of a full premium in the future.

In general, the waiver of a contractual right depends upon the doing of some act by the carrier from which the insured might reasonably conclude that the insurer would not insist upon one of its rights. See, e. g., Schifalacqua v. CNA Insurance, 567 F.2d 1255 (3d Cir. 1977). Additionally, however, in order for conduct to constitute a waiver of a right of cancellation, the insured must be misled or lulled into some delay in the performance of his obligations by the act of the insurer. See Brown v. Pennsylvania Cas. Co., 207 Pa. 609, 56 A. 1125 (1904); see also Sack v. Glens Falls Ins. Co., 360 Pa. 424, 61 A.2d 852 (1948). In this case, the Martha Company was not misled by Nationwide's prior acceptance of either a late or partial premium with respect to its conduct in May of 1976. The evidence demonstrates that the Martha Company failed to pay its premiums not because it did not believe that it was required to do so in order to maintain insurance coverage but because of financial difficulties which resulted in the filing of the Chapter XI proceeding in April of 1976. Further, Mr. Carros, who took over the responsibilities of the Martha Company with respect to the payment of insurance premiums at that time was not aware of either the problems relating to the partial or late payment in the past or that Nationwide had accepted such payments. Finally, the Martha Company did not rely upon Nationwide's prior course of conduct to its detriment because it had ample opportunity after receiving both the notice of cancellation and Nationwide's letter on May 28, 1976 that it would stand upon its cancellation to secure insurance coverage equivalent to that which had been supplied by Nationwide prior to the date of the fire. The Court is not convinced that Mutual Fire would have written a policy in the amount of $3,000,000 on the building and $600,000 on the contents had the Nationwide policy been in effect or had Mutual Fire believed that the Nationwide policy was in effect at the time such coverage was secured. Although the Mutual Fire policy covered neither loss of rents nor business interruption, the Martha Company could have acquired such coverage prior to October 9, 1976. The Martha Company did not change its position to its detriment in reliance upon the past course of conduct of Nationwide. Finally, since Nationwide had the right to cancel the policy for no reason so long as proper notice was given, even if it waived any right to cancel for nonpayment the cancellation was proper.

Based upon the foregoing discussion, the Court reaches the following

### IV. Conclusions of Law.

1. The notice of cancellation sent to the Martha Company by Nationwide on or

about May 14, 1976 effectively cancelled Nationwide's fire insurance and workmen's compensation policies as of June 1, 1976.

2. Nationwide's acceptance of a partial payment of a past due premium in January of 1976 and of a late payment on February 24, 1976, did not constitute a waiver of Nationwide's right to cancel the policy for the Martha Company's failure to submit the entire past balance of premiums due by the effective date of cancellation.

3. Nationwide's agent, Gwilym Maddock, did not agree with George Carros, the President of the Martha Company, to extend coverage beyond that date in consideration of the partial payment of the premium then due plus an agreement by the Martha Company to remit the balance of such outstanding premium in June and July of 1976.

4. The Nationwide policy was not in effect on October 9, 1976.

An appropriate order will be entered directing the entry of judgment in favor of the Defendant.