**Emil ZARBOCK, d/b/a Emil Zarbock Garage, Plaintiff,**

v.

**CHRYSLER CORPORATION and Chrysler Motors Corporation, Defendants.**

**Civ. A. No. 6817.**

United States District Court
D. Colorado.

Sept. 21, 1964.

Catherine F. McCleary, Ordway, Colo., and Ralph N. Wadleigh, La Junta, Colo., for plaintiff.

Haskell, Helmick, Carpenter & Evans, Denver, Colo., and Hira D. Anderson, Jr., Detroit, Mich., for defendants.

ARRAJ, Chief Judge.

Plaintiff instituted this action against defendants under the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–1225, to recover damages for an alleged

lack of good faith in failing to comply with the provisions of certain franchise agreements between the plaintiff and defendant. Trial was to the Court without the intervention of a jury, and at counsel's request simultaneous briefs and written argument were submitted in lieu of oral argument.

## Discussion

Plaintiff has been a Chrysler dealer in Ordway, Colorado, since 1940. On November 19, 1952, he executed a "Sales Agreement Between Chrysler Direct Dealer and Chrysler Corporation, Chrysler Sales Division." This agreement, as amended, governed the relationship between the parties until it was cancelled and new agreements were entered into on October 4, 1957. These later agreements consisted of the "Chrysler-Plymouth Direct Dealer Agreement" and the "Imperial Direct Dealer Agreement." Both of these agreements were in effect at the time of trial.

During the years 1957 through 1960, until the commencement of this action on June 2, 1960, plaintiff experienced many instances of considerable delay between order dates and actual delivery of new cars to him. There were also several occasions during this period when plaintiff was drafted to pay for cars prior to their actual receipt. In the latter part of 1958, defendant's agents asked plaintiff to relinquish the Imperial franchise. He refused to do so, and defendant abandoned its efforts to obtain relinquishment. In 1960, after the commencement of this action, plaintiff obtained a Valiant franchise from defendant.

From these facts evidencing certain delays, early drafting and miscellaneous problems, plaintiff alleges defendant failed to "act in good faith" within the meaning of 15 U.S.C. § 1222. We now turn to a closer analysis of each of these three general problem areas.

## Delivery Delays

Plaintiff has submitted into evidence over one hundred specification schedules, which show lengthy delays between order and delivery; several were in excess of forty-five days, but only nine were in excess of ninety days. The average delivery time was probably from four to six weeks. Plaintiff concedes that "four to five weeks" is normal delivery time, and it is to those deliveries substantially in excess of that time which he directs his complaints.

At least seventy five percent of plaintiff's orders were "sold" orders, that is, sold to a specific customer. These orders necessarily reflect customer preferences in the form of special body styles, color combinations, accessories and equipment. Defendant has offered some plausible explanation for almost every instance of prolonged delay cited by the plaintiff.

a. 1957 Model Year—This year was the one with the greatest number of delays in excess of ninety days. The evidence clearly establishes that 1957 was an "unusual year" in Chrysler history. In an effort to recapture what management figured to be its proper share of the market, the automobiles originally contemplated for the 1958 model year were brought into the market during the 1957 model year. Consequently, the lead time was shortened considerably, creating an abnormal production situation wherein demand for the products exceeded the supply. It took many dealers "two, three or four months" to fill a "sold" order. In fact, on a nationwide basis, defendant was not able to fill all of its "sold" orders that year.

The lengthy delays in delivery time for this model year were explained by defendant as being caused by production problems; more specifically, the demand for the Plymouth that year greatly exceeded defendants' expectations and only about one in five orders for this auto could be filled in the normal time. The Chrysler New Yorker sedan was in short supply that year, and the Windsor 4-door sedan was a "hot-item" that year and some orders for it were never filled.

For this model year, the evidence discloses no pattern of consistent lengthy delays in delivery, and there is no evi-

dence of intentional delays. Undoubtedly, the procedures for processing orders and effecting deliveries could have been improved upon, but the evidence fails to show that plaintiff's orders were treated or handled any differently than those of other franchised dealers.

b. 1958 Model Year—This was categorized by defendant's witnesses as also being an "unusual year" in Chrysler history; but it was unusual in an entirely different way. There was a general economic recession, production had been cut back, and the demand for cars was down. The evidence shows only two deliveries in excess of ninety days that year. Plaintiff admits on cross-examination that he had no real delay problems with this model year, hence industry conditions explaining late deliveries need not be elaborated upon.

c. 1959–60 Model Years—This period revealed further production problems in the Chrysler family. In late 1958, there was a glass strike by Pittsburgh Plate Glass, which supplies ninety percent of defendants' glass. This strike affected the procurement of 1959 model samples on time. In 1959, there was a steel strike, which further affected the production schedules.

A Plymouth Station Wagon was ordered on July 30, 1959, but was not received until 90 days later. This order was placed prior to introduction of the series, and early production of station wagons is always slow. The evidence shows that an 86 day and a 91 day delay were experienced on two Plymouth deliveries. Both of these cars contained Golden Commando Engines, which were extremely difficult to obtain, and both of these orders were placed just prior to the Christmas rush. The evidence further shows a delay in receiving a Chrysler display car of over six months. This longest of all delays has never been adequately explained. It was the general testimony of defendants' witness, however, that all 1960 display models were affected by the glass strike.

Evidence submitted by defendants discloses a compilation of 1959 model deliveries taking over 30 days. The figures are for the Kansas City Region, within which plaintiff's place of business fell. Many of the dealers in plaintiff's region received cars in excess of 100 days after they were ordered. This sampling was said to be somewhat typical of defendants' delivery problems for the years in concern.

The evidence further discloses in regard to all delays that a normal trucking time of 5–7 days in getting cars to Ordway must be considered. If the carrier did not have a full truck load, the load would have to be made up from elsewhere, and this slowed down the delivery time.

Plaintiff testified that because of certain of these delays, he lost customers; that to satisfy his customers, he was often forced to purchase from other dealers and sell at a less than normal profit; and that because of these sizeable delays in the acquisition of ordered cars, his business reputation suffered greatly in the years 1957–60. This evidence goes to the matter of damages if defendants are held accountable.

## Early Drafting

One of plaintiff's main complaints is aimed at "early drafting." He contends that he often had to pay for the cars prior to their delivery. The evidence shows that plaintiff was on occasion drafted prior to delivery. Twelve days was the earliest drafting, and approximately $203.00 was the total amount of interest lost through such practice during the three year period involved.

The franchise agreement did not forbid early drafting, and defendant submitted ample evidence to show that it was the company policy to draft dealers to coincide with delivery. The evidence fails to disclose any pattern of early drafting. Many times plaintiff was not drafted until well after the delivery. The evidence also establishes that defendant provided plaintiff with a form on which to report cases of early drafts. Plaintiff only reported once.

### Miscellaneous Problems

Plaintiff complains of receiving duplicate cars, which he had not ordered. The record shows that he received two cars not ordered, but he was able to sell these cars at a small profit.

Plaintiff testified that he was required to purchase large quantities of tools, only a small portion of which he could use. There is no evidence in the record that either shows or suggests that such purchases were required in order for plaintiff to retain his franchises. Also, there is no evidence that plaintiff was treated any differently than any of the other franchised dealers in connection with the acquisition of tools.

During the period in question, defendant sponsored certain sales promotion contests. Plaintiff received quotas for these contests, but was not allotted enough units for the particular contest periods to compete for the prizes. He apparently never sought larger quotas, and with the exception of the 1957 model year previously discussed, his orders were always honored, and filled, unless cancelled by him.

In January of 1958, plaintiff received about $40,000.00 worth of units which he had ordered, but which he did not expect to receive so promptly. His financing of these units delayed a capital improvements loan he had in progress and crippled his finances for a period. The complaint here seems to be that delivery was too fast. There is no evidence that this acceleration of deliveries was for the purpose of embarrassing plaintiff or of intentionally injuring him or his business.

In its entirety, the record shows some damages, specifically, $203.00 in interest, and damage to plaintiff's reputation and good will. Essentially, these are the facts, categorized as best they can be by this Court. Do they show a "lack of good faith" so as to constitute a cause of action under 15 U.S.C. § 1222?

### CONCLUSIONS OF LAW

██ Plaintiff has brought this suit under that portion of the Automobile Dealer Franchise Act which provides a cause of action against an automobile manufacturer who fails to "act in good faith in performing or complying with any of the terms or provisions of the franchise * * *." 15 U.S.C. § 1222. "Good faith" is defined in the Act as:

> "[T]he duty of each party to any franchise * * * to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: Provided, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith." 15 U.S.C. § 1221 (e).

Therefore, the actionable conduct must clearly involve "coercion or intimidation or threats of coercion or intimidation of the dealer."

The Act has been very recently construed in Globe Motors, Inc. v. Studebaker-Packard Corp., 328 F.2d 645 (3 Cir., 1964). Here it was stated that the statute did not provide a new remedy for breach of contract but created a new cause of action. An indispensable element of this new cause of action is not the lack of good faith in the ordinary sense, but a lack of good faith in which "coercion, intimidation or threats" are at least implicit. "Lack of good faith" is not to be liberally construed. Milos v. Ford Motor Co., 317 F.2d 712 (3rd Cir. 1963); Garvin v. American Motor Sales Corp., 202 F. Supp. 667 (D.C.W.D.Pa.1962), reversed on other grounds 318 F.2d 518 (3rd Cir. 1963); Pierce Ford Sales, Inc. v. Ford Motor Co., 299 F.2d 425 (2d Cir. 1962), cert. denied 371 U.S. 829, 83 S.Ct. 24, 9 L.Ed.2d 66 (1963).

██ Certainly a breach of contract is not a pre-requisite to showing "lack of good faith." Threats and coercion may be subtle. But the cases clearly establish that the burden of proving bad faith is a high one under the Act. Each

detrimental action taken by the manufacturer against the dealer should be considered in assessing bad faith. It seems, however, that the sum total of actions must fit together into some consistent pattern which may be construed as outright, or implied, coercion or intimidation.

Referring to the early drafting complaints, it does not seem that these can reasonably be construed as coercive. The total interest lost is small, the length of the premature periods is short and for every early drafting, there appears at least one or more late drafts. There is no evidence contrary to defendant's stated policy of drafting dealers to coincide with delivery as nearly as practicable.

As for the contests plaintiff could not compete in, the tools he had to buy but could not use, and the large unit shipments which disrupted his financing program; these are highly regrettable incidents, but the record fails to establish that plaintiff's treatment in these respects was any worse than other small dealers throughout the country. The ways and wiles of big business may indeed seem harsh, but this Act does not purport to provide a remedy against uniformly distasteful national policies by automobile manufacturers to their dealers.

Plaintiff was requested to relinquish his Imperial franchise. The Act itself states that " * * * persuasion, urging or argument shall not be deemed to constitute a lack of good faith." Supra, Section 1221(e). Perhaps, if plaintiff had not received Imperials when he ordered them, coercion or intimidation to give up the Imperial franchise might logically be inferred. But, he ordered fewer than five Imperials during the entire period in question, and all came in less than 90 days. Indeed, the delay problems were almost exclusively with Chryslers and Plymouths.

There seems no question that if plaintiff were singled out for repeated, excessive, and unexplainable delayed shipments, he might possibly sustain a cause of action under the Act. The evidence, however, does not disclose that such was the case.

The record shows that defendant did not seek to specifically explain away each of the hundred odd delays shown by plaintiff. Defendant's witnesses testified generally to production problems and showed evidence of other dealers with very similar delay problems. Defendant chose to give specific attention only to some of the very longest delays. Even those could not be explained away specifically and conclusively, for defendant corporation is too large to be capable of placing its finger on every order that passes through its offices. But one or another of defendant's witnesses did offer plausible, general reasons for each of the very excessive delays, i. e., the glass strike, the steel strike, a special engine order, a scarce body style or a particular accessory.

The record further discloses that not every one of the very long delays has been explained away. But the record in its entirety fails to reveal any consistent pattern of late delivery. Those very few instances, which have not been adequately explained away, can in no way be used to infer coercion or intimidation.

Plaintiff was awarded a Valiant franchise by defendant in 1960. Each of defendant's witnesses, who had known plaintiff through business, testified that he had never received any specific orders regarding how plaintiff should be treated or how his orders should be processed. Each said plaintiff's reputation with defendant company was good, and that he was a good salesman with a high turnover for the size of his dealership. Plaintiff had never been asked to relinquish anything, except the Imperial franchise. Efforts had been abandoned on that, and today he retains franchises for the sale of Plymouths, Chryslers, Imperials and Valiants.

The record does not show discrimination against plaintiff or coercion or threats. It does not show that defendant willfully refused to comply in good

faith with the franchise or that defendant consistently refused to fill plaintiff's orders. The history of events reflects great hardships placed upon plaintiff, but it does not show "lack of good faith" as to constitute an action under the Automobile Dealers' Day in Court Act.

Plaintiff has failed to sustain his burden of proof. The defendant is entitled to judgment.

Defense counsel will promptly submit an appropriate form of judgment.

This Memorandum Opinion will constitute this Court's Findings of Fact and Conclusion of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.