**ARNOLD PONTIAC–GMC, INC., Appellant,**

v.

**GENERAL MOTORS CORPORATION.**

No. 85–3108.

United States Court of Appeals, Third Circuit.

Argued Oct. 1, 1985.

Decided March 14, 1986.

As Amended April 1, 1986.

James A. Mollica, Jr. (argued), Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, Pa., for appellee.

Gordon F. Harrington (argued), Greenlee, Derrico, Posa, Harrington & Rodgers, Washington, Pa., for appellant.

Before WEIS, BECKER and MANSMANN, Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

Plaintiff, Arnold Pontiac-GMC, Inc. (Arnold Pontiac), challenges in this appeal the grant of summary judgment in favor of defendant, General Motors Corporation (GMC) on numerous counts of a complaint charging breach of contract, anti-trust violations and violation of the Automobile Dealers' Day in Court Act. For the reasons outlined below, we will reverse the district court regarding its dispositions of: 1) the second cause of action in Count V of the complaint concerning the Buick franchise claim arising under Section 1 of the Sherman Act, 15 U.S.C. § 1, and 2) the first cause of action in count II of the complaint concerning the motor vehicle allocation claim (Truck Division) arising under the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 *et seq.* In all other matters, we will affirm the district court.

### I. *The Procedural History*

Arnold Pontiac commenced this action by Writ of Summons in Equity in the Court of Common Pleas of Washington County, Pennsylvania. GMC filed a Petition for Removal, causing plaintiff to file a federal court complaint. Arnold Pontiac's eight count complaint essentially asserts three claims: namely, a Buick franchise claim, a motor vehicle allocation claim and a product offering and pricing claim. The following itemization best summarizes the individual claims and their bases:

| Claim | Basis for Claim | Place of Assertion in Complaint |
|---|---|---|
| Buick franchise claim | common law breach of contract | First Cause of Action, Count I |
| motor vehicle allocation claim (Truck Division) | Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221 *et seq.* | First Cause of Action, Count II |
| motor vehicle allocation claims (Pontiac Division) | Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221 *et seq.* | First Cause of Action, Count III |
| product offering and pricing claim (Pontiac Division) | Sherman Act, Section 1, 15 U.S.C. § 1 | Second Cause of Action, Count I |
| product offering and pricing claim (Pontiac Division) | Sherman Act, Section 2, 15 U.S.C. § 2 | Second Cause of Action, Count II |
| motor vehicle allocation claim (Truck Division) | Sherman Act, Section 1, 15 U.S.C. § 1 | Second Cause of Action, Count III |
| motor vehicle allocation claim (Truck Division) | Sherman Act, Section 2, 15 U.S.C. § 2 | Second Cause of Action, Count IV |
| Buick franchise claims | Sherman Act, Sections 1, 2 15 U.S.C. §§ 1, 2 | Second Cause of Action, Count V |

In an order dated February 22, 1984, the district court granted GMC's Motions for Partial Summary Judgment and dismissed with prejudice all claims asserted in the complaint, except the First Cause of Action, Count II. Arnold Pontiac subsequently sought to have this interlocutory order certified for appeal purposes pursuant to 28 U.S.C. § 1292(b). This request for certification was denied by the district court by an order dated April 3, 1984, which also included a denial of Arnold Pontiac's January 20, 1984 Motion to Compel Production of Documents and to Compel Answers to Interrogatories.

Thereafter, on July 24, 1984, the district court issued an order which denied, in part, Arnold Pontiac's June 25, 1984 Motion to Compel Production of Documents. Finally, on January 28, 1985, the district court granted GMC's Motion for Summary Judgment and dismissed with prejudice the sole remaining claim in the complaint, the first cause of action, count II.

## II. *Scope of Review*

On appeal Arnold Pontiac faults these various orders entered by the district court. With regard to the order granting GMC's Motion for Partial Summary Judgment and the order granting GMC's Motion for Summary Judgment, Arnold Pontiac advances the existence of disputed facts in connection with the breach of contract claim and the antitrust claims which would militate against the granting of these motions. Insofar as the denial of its discovery motions are concerned, Arnold Pontiac asserts that the district court abused its discretion, by, *inter alia,* the failure of the court to require GMC to answer interrogatories and produce certain documents, and also the failure of the court to allow Arnold Pontiac to prove its discrimination claim as it related to truck allocation among the franchisees.

■ In reviewing the district court's grant of summary judgment, we are required to apply the same test the district court should have applied under Fed.Rule

1. Arnold Pontiac has been selling Pontiac automobiles in the same location since 1926, when

Civil Procedure 56; that is, we must determine whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there was no genuine issue as to any material fact and whether the moving party, GMC herein, is entitled to a judgment as a matter of law. *Hollinger v. Wagner Mining Equipment Co.,* 667 F.2d 402 (3d Cir. 1981).

■ With regard to our review of the district court's discovery orders, we note that the conduct of discovery is within the discretion of the district court and its decisions will be disturbed only upon a showing of an abuse of discretion. *Montecatini Edison S.p.A. v. E.I. duPont de Nemours & Co.,* 434 F.2d 70, 72 (3d Cir.1970). The grant of summary judgment in an antitrust action before the plaintiff has had a full opportunity for discovery, however, may constitute reversible error. *Mannington Mills v. Congoleum Industries,* 610 F.2d 1059 (3d Cir.1979); see also *Sames v. Gable,* 732 F.2d 49, 52 (3d Cir.1984).

## III. *The Relevant Facts*

Viewed in the light most favorable to the plaintiffs as the non-moving party defending the summary judgment motion, *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977), the relevant facts are as follows.

Arnold Pontiac is an authorized dealer of Pontiac automobiles and GMC trucks in Houston, Pennsylvania. Since 1968, Robert S. Arnold (Arnold) has been a co-owner of Arnold Pontiac and its "dealer-operator" pursuant to franchise agreements with the Pontiac and GMC truck divisions of defendant GMC.[1] In November, 1969, Arnold first contacted GMC's Pittsburgh area Buick representative to express interest in acquiring a newly vacant Buick franchise "point" in nearby Canonsburg, Pennsylvania, and incorporating it into his existing Pontiac-GMC dealership, an arrangement

Mr. Arnold's father entered into the initial dealership agreement with GMC.

known as "dual line representation." The Buick representative informed Arnold that GMC planned to maintain the Canonsburg point as an exclusively Buick dealership. Arnold repeated his request for the Buick franchise on numerous occasions over the next twelve years. From 1975 to 1979, GMC consistently informed Arnold that an application for a Buick franchise would be favorably considered only if he would agree to provide expanded, modernized facilities at a more desirable location. Notwithstanding his continued expressions of interest, at no time during this period did Arnold agree to undertake the requisite expansion, renovation and relocation within a period of time acceptable to GMC.

The sequence of events relative to the present action commenced in February, 1980, when Arnold initiated another round of discussions with GMC. In a letter to Pittsburgh Area Zone Manager G.B. Shane dated February 28, 1980, Arnold stated that although he had not been "able to build a totally new facility in 1978 due to site and financial setbacks," he had recently made substantial improvements in Arnold Pontiac's existing facilities.[2] Shortly

thereafter, Buick Division's Shane and Pontiac Division's Charles Lloyd met with Arnold at his dealership to discuss the capital and facilities requirements for a Buick franchise. Arnold does not contend that either Shane or Lloyd actually told him that expansion and renovation of Arnold Pontiac's existing facilities met GMC's earlier objections. Rather, Arnold argues that "[a]t no time during this meeting did either Mr. Lloyd or Mr. Shane say anything which would lead me to believe that the additional facility acquisitions would not be satisfactory for a Buick-Pontiac-GMC dual."

On April 3, 1980, GMC representative R.F. Pfeiffer attended a sales promotion meeting with members of the Better Buy Buick Association, an organization of Pittsburgh area Buick dealers. After the meeting, four Buick dealers discussed with Pfeiffer rumors concerning Arnold Pontiac's acquisition of a Buick franchise. These dealers expressed disapproval of any plan to add a Buick franchise to the Canonsburg-Houston, Pennsylvania area. Pfeiffer memorialized the events of this meeting in a memo for his superior, G.B. Shane.[3]

---

**2.** According to Arnold's letter,

We purchased and remodeled a new Body Shop and Bulk Parts Storage facility one block away, enlarged and added parts bins to the Parts Dept. We have remodeled Service Office and customer waiting area in Showroom, and moved Reconditioning Operation to another building across the street, repainted and refurbished the Showroom Area to display approximately 30 New Cars ...

**3.** The memo in its entirety is as follows:

April 3, 1980

To: Mr. G.B. Shane

At the conclusion of our sales promotion meeting today, I had a meeting with Messrs. Gray, Oliverio, Baer and Samson. The meeting was requested by Mr. Gray. The purpose of this meeting was to discuss Buick's closing of the open point in Canonsburg, PA.

At the outset of the meeting, Hud Samson said that the Advertising Dealer Group on Thursday had a meeting and agreed that if Buick Motor Division put a dealer into the Canonsburg-Houston area, they, as a group, would take action not to purchase any of our programs or cooperate with us in any of our endeavors. He also said that they are planning to take legal action financed by the Association against having this

point approved. They asked some specific questions as follows:

1. Would we be signing this dealer, Arnold Pontiac, before Monday of this coming week.

I replied No.

2. Why would we be soliciting new car orders from the dealer if we were not going to sign a new dealer in the near future.

I replied that I was not in a position to tell them when we would be signing the dealer and that the paperwork was still being processed.

3. Why was this approval to put a dealership in Canonsburg not previously discussed with the surrounding dealers.

I replied—this has been an open point for 11 years and the area had not been getting price class or performance effectiveness and its our option to close a point at our discretion.

4. Are we planning on putting this dealer into his current facility.

I said I would check into it and gave them no specific answer.

The question was also proposed by Hud Samson that the reason the Association is taking legal action in this matter is that they feel that if this can happen to the dealers near the Canonsburg area it can also happen to any other dealers in

Also in early April, 1980, Patricia Joan Roberts, the Buick Business Management Manager for the Pittsburgh area, met with Arnold and provided him with wholesale order forms for Buick automobiles. GMC asserts that it was a standard practice to provide prospective Buick dealers with wholesale order applications so that if their franchise applications were approved, automobile orders could be processed quickly. Arnold completed these forms shortly thereafter, and sent his order to GMC. On April 11, 1980, Shane returned the forms to Arnold, explaining that the Buick Division had not yet acted on his franchise application. Shane further wrote, "[a]s I mentioned to you on the phone, we have requested a 'Blueprint' for Houston, but have no information on our request. We, therefore, are returning the order to you so that there is no misunderstanding at this time."

On September 18, 1980, Buick and Pontiac representatives Shane and Lloyd again met with Arnold to discuss Arnold's eligibility for adding Buick to his Pontiac Selling Agreement. At the meeting Arnold was advised that his facility was not adequate and was asked to consider signing a "Facility Modification" letter which would require him to build or acquire new facilities within three years. Shane's September 23, 1980 memorandum of the meeting summarized his findings:

The main dealership facility was built 60 years ago and it looks it. It is not representative of a modern up to date G.M. dealer. I explained the "Facility Modification" letter and Mr. Arnold will not accept this provision and will not agree to build or acquire new facilities within three years. I was hesitant to recommend this proposal to Buick management

because of the facilities, but I would submit a summary for their review and information.

In his September 24, 1980 memorandum to F.D. Adams, Manager of Buick Franchise Administration, Shane recommended that Buick not grant a franchise to Arnold because of his refusal to provide new facilities within three years. Shane's memorandum advised:

Both the Pontiac Zone Manager and I are of the opinion that this dealer's facilities are deficient in appearance and not representative of today's G.M. Dealers.

Mr. Arnold is not agreeable or willing to correct this deficiency through building another building or obtaining more modern facilities. Accordingly, I recommend that we do not offer the Buick Sales and Service Agreement to him at this time and request permission to return his application to him.

Adams accepted Shane's position and in a memorandum dated December 11, 1980 to J.R. Rowley of the Dealer Organization Department, recommended that Arnold's franchise application be rejected.

The dealer's facilities are not adequate when considering the dealer uses 6 buildings in the operation and the main dealership facility was built 60 years ago and is not neat in appearance. Our Zone Manager indicated that he mentioned the concept of a "New Dealer Facility Letter Agreement" and Mr. Arnold stated that he would not agree to build or acquire new facilities within three years.... Based on the results of the meeting [between Lloyd, Shane and Arnold on September 18 or 19, 1980] our zone desires

the association. This is the reason why the association decided to take action.

Another question posed was why did we decide to take this specific move in appointing a dealer in Canonsburg at such a difficult time in retail automobile business.

I replied: We have been studying this point for a number of years and decided we needed the additional sales volume from the point and proceeded to process the closing of this point. I gave them no further information. They may want to meet with you and myself this next

week some time to review our position. I also advised them that it was their prerogative to take what action they deemed necessary, but I first suggested that they discuss this situation with you. Mr. Gray asked that you call him Monday some time.

I plan to be in the office around 9 AM on Monday, and I'll review this information with you.

R.F. PFEIFFER

to advise Mr. Arnold of the decision by Buick not to offer the Dealer Agreement to his dealership due to his non-commital regarding facilities. . . .

On January 15, 1981, Shane informed Arnold that because of Arnold's unwillingness to guarantee provision of new facilities within three years, the Buick division would not consider his application for the Canonsburg-Houston franchise.[4]

In correspondence with GMC from January 19, 1981 to January 8, 1982, Arnold expressed his dissatisfaction with GMC's decision not to accede to his request for a Buick franchise. On January 29, 1982 J.G. McClintock, Director of Buick Dealer Organization Department, informed Arnold that Buick no longer intended to establish any additional Buick dealer representation in the Houston, Pennsylvania area.

During 1981, 1982 and 1983, GMC delivered substantial numbers of GMC trucks to Arnold Pontiac. All of these trucks had been ordered by Arnold Pontiac, but they were delivered after what Arnold believed to be the peak selling period. Arnold believed that these late deliveries caused him to lose truck sales.

In 1982, GMC discontinued production of six-passenger Pontiac automobiles, but continued production of six-passenger Cadillacs, Buicks and Chevrolets. Also in 1982, the suggested retail price differentials between certain Pontiac and Chevrolet automobiles were increased, and certain equipment options were dropped from Pontiac models, allegedly making Pontiac automobiles more expensive and less attractive vis-a-vis comparable Chevrolet automobiles. GMC states that these decisions were prompted by a 1980 policy change to concentrate on smaller, more fuel efficient automobiles in response to the national economy and consumer preferences, and a 1982 policy to offer greater consumer choice by establishing a "name plate differential" among automobiles of various GMC divisions. Because a substantial portion of Arnold Pontiac's business was derived from the sale of the six-passenger Pontiac models, Arnold believed that changes in model offering and price differentials adversely affected his business.

### IV. The Propriety of Summary Judgment

#### A. The Buick Franchise Breach of Contract Claim

It is well settled that agreement or mutual assent between parties is essential for the formation of a contract. *Restatement (Second) of Contracts* § 17 (1981).[5] Uncontroverted documentary evidence offered in support of GMC's motion for summary judgment clearly establishes the lack of any agreement between GMC and Arnold Pontiac concerning Arnold Pontiac's request for a Buick dealership.

Arnold Pontiac contends, on the basis of Arnold's meetings with Shane and Lloyd in March, 1980 and with Roberts in early April, 1980, that there existed a contract between GMC and Arnold Pontiac for the grant of a Buick franchise between GMC and Arnold Pontiac. Arnold relies heavily on the fact that during the course of his discussions about the Buick dealership, he was furnished with order forms for Buick vehicles. Patricia Joan Roberts explained during her deposition on April 15, 1983, however, that it was her standard practice to provide prospective Buick dealers with wholesale order applications so that if their franchise applications were approved, automobile orders could be pro-

---

4. Shane's letter to Arnold stated:
   After examining your present dealership facilities, certain requirements were established by Buick and Pontiac for your dealership to provide adequate facilities within three years from date of executing the Dealer Agreement if so approved by Buick.
   In subsequent discussions you advised that you would not agree to conditions and terms of a "New Dealer Facility Letter Agreement" which would modify the Dealer Agreement and not agree to build or acquire adequate facilities. Therefore, you are hereby advised that Buick does not intend at this time to further consider your application for a Dealer Agreement at Houston, Pennsylvania.

5. The parties do not dispute that Pennsylvania law governs the contract claims.

cessed quickly. Finally, as Arnold acknowledged in his deposition of August 30, 1983, even if GMC representatives Shane, Lloyd or Roberts had promised to approve his application, such a promise would have been beyond their authority.

Facts such as those asserted by appellant do not establish the manifestation of mutual assent necessary to create a contract. Rather, the record is clear that at no time did GMC grant or promise to grant a Buick franchise to Arnold Pontiac. Absent such agreement between the parties, their communications may constitute negotiations but do not establish the elements of offer and acceptance required for contract formation. *Restatement (Second) of Contracts*, § 26; *Beliron Construction Co. v. Potomac Insurance*, 230 Pa.Super. 379, 385, 326 A.2d 499, 502 (1974). In the absence of any genuine issue of material fact supporting the existence of a contract between Arnold Pontiac and GMC regarding the Buick franchise, the district court did not err in granting appellee's motion for summary judgment on the Buick-Franchise contract claim.

## B. *Antitrust Claims*

■ We have often stated that summary judgment in antitrust cases is not favored. *Mannington Mills v. Congoleum Industries, Inc.; supra* at 1073. *See also Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 165 n. 2 (3d Cir.1979) Summary judgment will be granted in such cases, however, in the "absence of any significant probative evidence tending to support the complaint." *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *see also Tose v. Pennsylvania Bank, N.A.*, 648 F.2d 879, 883 (3d Cir.), *cert. denied*, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed. 208 (1981).

The present record before us does not, however, support the district court's grant of summary judgment with regard to the Sherman Act Section 1 claim involving the Buick franchise,[6] and so we will reverse the district court's decision on this claim.

### 1. *Sherman Act Section 1 Claims*

■ Section 1 of the Sherman Act prohibits "[e]very contract, combination ..., or conspiracy in restraint of trade...." 15 U.S.C. § 1. To establish a civil cause of action under Section 1, a plaintiff must prove four elements:

(1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy.

*Tunis Bros. v. Ford Motor Co.*, 763 F.2d 1482, 1489 (3d Cir.1985). The presence of concerted action is thus an essential element of a claim under Section 1; mere unilateral or independent activity, whatever its motivation, cannot give rise to an antitrust violation. *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 473 (3d Cir.1985)

■ To establish a Section 1 violation for failure to deal, a plaintiff must prove that the defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984) (citations omitted). This requires "proof of a causal relationship between competitor complaints" and the decision not to deal. *Edward J. Sweeney & Sons, Inc. v. Texaco*, 637 F.2d 105, 111 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). Absent such concerted action, a "manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes as long as it does so independently." *Monsanto*, 465 U.S. at 761, 104 S.Ct. at 1469. Thus, the Section 1 plaintiff must produce evidence "that tends to exclude the possibility that

6. This is represented as the second cause of action in Count V of the complaint.

the [defendants] were acting independently." *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471.

■ In its first Section 1 claim, plaintiff alleges that GMC's decision not to extend a Buick franchise to Arnold Pontiac was the product of a conspiracy between GMC and Pittsburgh-area Buick dealers. In support of its contention, plaintiff submits a memo written by GMC representative R.F. Pfeiffer which recorded the events of an April 3, 1980, sales promotion meeting of the Better Buy Buick Association, an association of Pittsburgh-area Buick dealers affiliated with GMC.[7] During the meeting, the association members inquired about GMC's intention to place an additional Buick dealer in the Canonsburg-Houston area and whether Arnold was to be signed on as that dealer. Pfeiffer, according to his memo, answered that the placement of a Buick dealer in the designated area was a possibility. Moreover, he indicated that GMC needed the additional sales volume and had been considering such a marketing strategy for a number of years. In response, the association members told Pfeiffer that if GMC placed a dealer in the Canonsburg-Houston area, they would not purchase any of GMC's programs and would not cooperate with GMC in any of its endeavors. Furthermore, the dealers indicated to Pfeiffer that they were planning to take legal action to prevent the placement of a new Buick franchise in the area.

The representation by Pfeiffer in this memo that GMC was considering the addition of a Buick franchise in the Canonsburg-Houston area is consistent with the representations GMC made to Arnold earlier at the meeting it held with him in March of 1980. At that meeting Buick representative, G.B. Shane, and Pontiac representative, Charles Lloyd, discussed with Arnold the possibility of his obtaining the Buick franchise. In both Arnold's deposition and affidavit, he states that no mention was made at this March meeting that his present dealership facility was inadequate.

Moreover, Arnold offers evidence that within a week or ten days of the March meeting, Pat Roberts, representing Buick, delivered to him car order forms, ordering information and specification sheets. Roberts told him to order an initial stock of Buick automobiles and to forward the order to the Buick Zone Manager. Arnold did so in late March. Following the April 3, 1980 Better Buy Buick Association's meeting, however, Zone Manager Shane returned the wholesale car orders to Arnold in a letter dated April 11, 1980, explaining that Buick had not yet acted on the franchise application.

Arnold has also introduced evidence that GMC's decision to deny him the Buick franchise was not communicated to him until five months after the Better Buy Buick Association had held its meeting and had given its ultimatums to GMC. On September 18, 1980, both the Pontiac and Buick Zone managers once again met with Arnold to evaluate his eligibility for the Buick franchise. The inadequacy of Arnold's facility was raised for the first time in these new negotiations, which had begun back in March of 1980, and Arnold was asked to consider signing a "Facility Modification" letter which would require him to build or acquire new facilities within three years. When Arnold refused to commit to providing new facilities, GMC reclassified the Canonsburg-Houston area as a "deferred open point," which meant Buick would no longer actively seek applicants for a Buick franchise at this location.

Reviewing this evidence and drawing the inferences from the underlying facts in the light most favorable to Arnold Pontiac as the party opposing the summary judgment motion, *Goodman, supra,* at 573, we must infer that the Better Buy Buick Association's conduct contributed to GMC's decision not to award Arnold the Buick franchise. GMC's position concerning the award of a Buick franchise to Arnold changed, it seems, only after it learned of the Association's April 3, 1980 meeting, where the Pittsburgh Buick dealers indi-

---

**7.** See note 3 *supra,* for complete text of Pfeiffer memo.

cated their disapproval of the placement of an additional Buick franchise in the Canonsburg-Houston market and their intent not to cooperate with GMC if the franchise was awarded. Until the April 3, 1980 meeting of the Association, Arnold Pontiac apparently was considered to be a potential Buick franchise point. Arnold was given order forms for Buick models and was told to complete them. No mention was made by GMC that Arnold Pontiac's facility was inadequate until September of 1980; from the initial discussion in March of 1980 to September, GMC did not fault Arnold's facility or location. It was only after the September 3rd meeting of the Better Buy Buick Association that this issue was raised by GMC. Moreover, until the April 3, 1980 meeting of the Better Buy Buick Association, the Canonsburg-Houston area was apparently thought by GMC to be a viable sales point for Buick automobiles which could generate needed, additional sales volume.

Arnold Pontiac, as a Section 1 plaintiff under the Sherman Act, has produced evidence "that tends to exclude the possibility that [GMC acted] independently" *Monsanto, supra* at 1471, when it declined to award Arnold the Buick franchise. Of course, at trial GMC may be able to convince the fact finder that the evidence does not support plaintiff's allegations. It could perhaps show that its decision to deny Arnold Pontiac the franchise was the result of its own marketing strategy, notwithstanding the conduct of the Better Buy Buick Association. At present, however, in reviewing the grant of summary judgment we must assume the facts and inferences therefrom otherwise, given the applicable standard which we must apply on appeal. *Accord, Cernuto, Inc., supra,* at 170. Accordingly, we find it necessary to reverse the district court's order on this issue.

■ In its second Section 1 claim, plaintiff alleges that GMC conspired with Buick, Chevrolet and Pontiac dealers to drive Pontiac dealers out of business by discontinuing production of six-passenger model Pontiac automobiles and by initiating price and option changes in other Pontiac models. We note that Arnold Pontiac introduced no evidence to suggest any such concerted action by GMC and its dealers, nor did it introduce evidence to suggest that GMC's production, price and option offering decisions were motivated by reasons other than the independent business judgment of GMC (*e.g.,* that six-passenger models were not a profitable item). Moreover, affidavits submitted by GMC in support of its motion for summary judgment affirmatively show that this was indeed the case. Plaintiff has failed to meet its evidentiary burden under Section 1 of the Sherman Act. *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *Edward J. Sweeney & Sons, Inc. v. Texaco,* 637 F.2d 105 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). Thus, we will affirm the district court's decision on this issue.

■ Plaintiff's final Section 1 claim concerns GMC's deliveries of GMC trucks to Arnold Pontiac during 1981 and 1982. In support of this claim, plaintiff fails even to assert the existence of the requisite conspiracy or concerted action. Since there is no conspiracy or concerted action for the purpose of Section 1 of the Sherman Act when a corporation merely acts in concert with its own employees, *Tose v. First Pennsylvania Bank, N.A.,* 648 F.2d 879, 893–4 (3d Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981), plaintiff has thus failed to set forth a valid Section 1 cause of action. *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Even if plaintiff has alleged some concerted activity, plaintiff introduced no evidence tending to exclude the possibility that GMC acted independently or simply in response to Arnold Pontiac's schedule of orders.

### 2. *Sherman Act Section 2 Claims*

■ Plaintiff's claims under Section 2 of the Sherman Act derive from the application of three legal theories (monopolization, attempted monopolization, and conspiracy to monopolize) to three factual

transactions (GMC's denial of a Buick franchise, GMC's changes in Pontiac automobile pricing, product and option offering, and GMC's delivery of GMC trucks). We need not set forth or analyze the substantive laws of monopolization, for plaintiff has offered nothing more than conclusions, nor has it demonstrated any genuine issues of material fact that might support any of these claims. To meet the evidentiary burden required to proceed to trial, it is clear that, even in the antitrust context, "a party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him." *First National Bank v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). A court is not required to extend the right to trial to "anyone who files an antitrust complaint setting forth a valid cause of action ... notwithstanding the absence of any significant probative evidence tending to support the complaint." *Id.* at 290, 88 S.Ct. at 1593. Because there existed no genuine issue of material fact concerning plaintiff's Section 2 claims, the district court did not err in granting defendant's motion for summary judgment on this issue.

### C. *Automobile Dealers' Day in Court Act Claims*

■ The Automobile Dealers' Day in Court Act permits a dealer to recover damages against a manufacturer that are caused by the manufacturer's failure "to act in good faith in performing or complying with any of the terms or provisions of the franchise agreement." 15 U.S.C. § 1222. To establish the requisite failure to act in good faith, a plaintiff must demonstrate that the manufacturer's conduct includes "coercion or intimidation" of the dealer. 15 U.S.C. § 1221(e); *Rea v. Ford Motor Company*, 497 F.2d 577, 584–85 (3d Cir.), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974); *Hanley v. Chrysler Motors Corp.*, 433 F.2d 708, 712

(10th Cir.1970). *Kaiser v. General Motors Corp.*, 396 F.Supp. 33 (E.D.Pa.1975), *aff'd*, 530 F.2d 964 (3d Cir.1976).

■ In this case, plaintiff's complaint alleges damages caused by GMC's decision to stop producing six-passenger Pontiac automobiles, its changes in suggested pricing and option offerings for other Pontiac models, and its discriminatory delivery of GMC trucks. With regard to the Pontiac Division vehicle allocation claim,[8] plaintiff has failed to allege or provide evidence that GMC's conduct included "coercion or intimidation." Thus, because there are not sufficient facts to indicate a lack of good faith as defined by the Act, the district court appropriately granted summary judgment as to this claim. *Salco Corp. v. General Motors Corp.*, 517 F.2d 567 (10th Cir.1975); *Berry Brothers Buick, Inc. v. General Motors Corp.*, 257 F.Supp. 542 (E.D.Pa.1966), *aff'd*, 377 F.2d 552 (3d Cir.1967).

■ With regard to the discriminatory delivery of GMC trucks claim,[9] however, we find it necessary to reverse the district court's grant of summary judgment, for the reason that plaintiff was denied a full opportunity for discovery on this claim. *Mannington v. Congoleum Industries*, 610 F.2d 1059 (3d Cir.1979). In light of this, we find that the district court's grant of summary judgment on this issue was premature.

In order to prove its discriminatory delivery claim, plaintiff sought to procure from GMC the allocation of trucks to individual dealers as well as order forms submitted by the Pittsburgh Zone dealers. GMC refused to produce this data considering it to be confidential. The district court's order of July 24, 1984 stated that GMC only had to supply the model line allocations to the Pittsburgh GMC Truck Zone for the years 1981, 1982 and 1983. This court order, contends plaintiff, deprived it of a review of the trucks actually delivered to the Pittsburgh Zone dealers relative to the orders they placed. Without access to the order

---

**8.** This claim is identified in the complaint as the first cause of action in Count III.

**9.** This claim is identified in the complaint as the first cause of action in Count II.

forms, plaintiff contends that it was impossible for him to prove discriminatory deliveries of GMC trucks.

We agree with plaintiff that the district court's limitation upon its discovery request prevented it from being able to prove the Automobile Dealers' Day In Court Act claim regarding the allocation of trucks. From plaintiff's brief and oral argument, we understand that this particular Dealers' Day In Court argument involved one of coercion or intimidation constituting bad faith dealing on the part of GMC; that is, Arnold Pontiac complains that it was slowly being forced out of the market by the allocation of the trucks imposed by GMC on plaintiff during the 1981, 1982 and 1983 model years. See *McGeorge Car Co., Inc. v. Leyland Motor Sales, Inc.*, 504 F.2d 52 (4th Cir.1974).

Although plaintiff placed its orders for trucks in a timely manner, plaintiff alleged that GMC either delayed processing of the orders or withheld distribution of the new model line to plaintiff early in the model run, but later dumped the inventory on plaintiff at the end of the model run. Consequently, plaintiff maintains that because of the unevenness of its truck inventory, its truck sales declined. Plaintiff was not able to fill orders for the trucks early in the model run because it did not have the inventory. Conversely, at the end of the model run when GMC dumped the old inventory on plaintiff, plaintiff had the trucks but no customers, the customers either having gone earlier to another dealer who was able to provide the merchandise or awaiting the arrival of the next year's new model line. Arnold succinctly expressed the problem in his deposition:

> [I]f you don't have anything to sell, you can't sell it. If you don't have an inventory to sell from, you can't attract customers to buy.

Such conduct on the part of GMC if able to be shown by credible evidence might sufficiently prove the bad faith element necessary for establishing a claim under the Automobile Dealers' Day In Court Act. For this reason, we find that the district court erred in not permitting plaintiff full discovery on this claim. It may be that the district court was particularly impressed by some evidence or felt that inferences could be drawn. We are unable, however, to discern that here in the absence of any statement of reasons by the district court. More importantly, we are unable to perform our function on the face of this present record without this evidence.

Accordingly, we will reverse the grant of summary judgment on this claim and order that plaintiff be allowed to complete its discovery consistent with our opinion. The district court should hold the motion for summary judgment in abeyance until the discovery is completed.

### IV. *Discovery*

Plaintiff also appeals from the district court's order dated April 3, 1984, which denied its motions to compel production of documents dated January 20, 1984. Plaintiff, however, has not provided evidence that the district court's denial of its motions constituted a "gross abuse of discretion resulting in fundamental unfairness...." *Voegeli v. Lewis*, 568 F.2d 89, 96 (8th Cir.1977).

In particular, plaintiff points to GMC's objections to interrogatories seeking the name(s) of persons who "made the decision to remove the option of the computer command control omissions system from the Parisienne automobile"; the name of the person who "determined the price that the Pontiac ... would be for model years 1980, 1981, 1982, 1983"; that person's reasons for price differentials between Pontiacs and other GMC cars; the factory costs with and without options for all Chevrolet, Buick, Oldsmobile, and Pontiac automobiles for the years 1980–83; and the percentage of profit added by GMC to each automobile with and without options. GMC objected to these questions on ground of relevancy and/or privilege, claiming that answers would divulge trade secrets. Plaintiff contends that the information was necessary to establish his "offering and pricing" claims under antitrust laws and the Automobile Dealers' Day in Court Act.

Clearly, even if answers to the disputed interrogatories had been compelled, the information obtained thereby would not have enabled plaintiff to show the requisite "concerted action," "monopolization," and "coercion or intimidation" necessary to support its claims.

Finally, with regard to plaintiff's overall assertion that it did not have an adequate opportunity to complete discovery, the record reflects that the district court allotted ample time for discovery prior to its ruling on these particular claims. Finding no abuse of discretion we will affirm the district court's order dated April 3, 1984 as it relates to the denial of plaintiff's Motion to Compel Production of Documents and to Compel Answers to Interrogatories.

## V. *Conclusion*

For the foregoing reasons, we will reverse the district court regarding its disposition of the Buick franchise claim arising under Section 1 of the Sherman Act and its disposition of the motor vehicle allocation claim (Truck Division) arising under the Automobile Dealers' Day In Court Act. With regard to the latter claim, we will order further discovery for plaintiff consistent with our opinion. In all other matters, we will affirm the district court.

BECKER, *Circuit Judge,* concurring and dissenting:

I join in all of the majority's opinion and judgment except for its disposition of the Sherman Act § 1 Buick franchise claim and the Automobile Dealers' Day in Court Act GMC truck delivery claim. As to those matters, I respectfully dissent.

## I. *SHERMAN ACT § 1 CLAIM* (Buick franchise)

In my view the Sherman Act § 1 claims are controlled by *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), which requires of plaintiffs "proof of a causal relationship between competitor complaints" and the decision not to deal. *Edward J. Sweeney & Sons, Inc. v. Texaco,* 637 F.2d 105, 111 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). Ab-

sent such concerted action, a "manufacturer of course ... has a right to deal, or refuse to deal, with whomever it likes...." *Monsanto,* 465 U.S. at 761, 104 S.Ct. at 1469. Moreover, and most importantly for this case, in order to resist a motion for summary judgment, the Section 1 plaintiff must at the very least introduce evidence that "tends to exclude the possibility that the [defendants] were acting independently." *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471; *Fragale & Sons Beverage Co. v. Dill,* 760 F.2d 469, 473 (3d Cir.1985).

In its Buick franchise Section 1 claim, Arnold Pontiac alleges that General Motors' decision not to provide it with a Buick franchise was the product of a conspiracy between General Motors and Pittsburgh-area Buick dealers. In support of its contention, it submits the minutes of a meeting of the Better Buy Buick Association during which association members urged Buick division representatives not to approve an additional Buick franchise for the Canonsburg-Houston, Pennsylvania area. While this meeting is evidence of an opportunity to conspire, standing alone it fails to satisfy plaintiffs' evidentiary burden under the antitrust laws. Arnold Pontiac has also introduced evidence that General Motors communicated its decision not to award the Buick franchise *after* the "Better Buy" association meeting, albeit five months after. However, even the most favorable inference reasonably to be drawn from this evidence is not sufficient to suggest the existence of concerted action between General Motors and Pittsburgh-area Buick dealers concerning the denial of a Buick franchise to Arnold Pontiac. For, as I read the record, appellant has not introduced evidence, required by *Spray-Rite,* that tends to exclude the possibility that General Motors had independent reasons for its decision.

The late Judge Abraham Freedman of this Court was fond of saying at decision conferences: "The way you come out in this case depends on how you go in." *See Larry Muko, Inc. v. Southwestern Pennsylvania Building and Construction*

*Trades Council, et al.,* 609 F.2d 1368, 1377 (Aldisert, J., dissenting). The majority's statement that "the sequence of events relative to the present action commenced in February, 1980, when Arnold initiated another round of discussions with GMC" is a striking example of the sagacity of Judge Freedman's observation. By using the events commencing in February, 1980, as the calipers for its evaluation of the evidence, the majority is more easily able to conclude that the requirements of *Spray-Rite* have been met:

> GMC's position concerning the award of a Buick franchise to Arnold changed, it seems, only after it learned of the Association's April 3, 1980 meeting, where the Pittsburgh Buick dealers indicated their disapproval of the placement of an additional Buick franchise in the Canonsburg-Houston market and their intent not to cooperate with GMC if the franchise was awarded....

Majority at 574. What the majority ignores is the fact that "the sequence of events relative to the present action" commenced not in 1980 but in 1969, the year in which Arnold Pontiac first sought a Buick dealership, was first told it would have to modernize its facilities completely, and first refused to do so. Moreover, in the majority's own words, at least from 1975 to 1979

> GMC consistently informed Arnold that an application for a Buick franchise would be favorably considered only if he would agree to provide expanded, modernized facilities at a more desirable location. Notwithstanding his continued expressions of interest, at no time during this period did Arnold agree to undertake the requisite expansion, renovation and relocation within a period of time acceptable to GMC.

Majority at 569.

General Motors' consistent rejection of Mr. Arnold's franchise application was not surprising. Arnold Pontiac's main dealer-

ship facility was built by Mr. Arnold's father in the 1920's and it "looked it." It was not representative of a modern up to date G.M. dealer." (Shane Memo of September 23, 1980), *see* majority at 571. Although General Motors had adopted a policy of requiring dealers to operate from attractive modern facilities along major arteries, Mr. Arnold consistently refused to expend the sums necessary for a major upgrade, instead instituting only cosmetic changes. Thus, a basis for independent action stands out like the proverbial sore thumb—Mr. Arnold's continuing failure for well over a decade to provide facilities in accordance with General Motors' uniform nationwide standards. Arnold Pontiac has not introduced evidence to exclude the possibility that General Motors had such independent reasons for its decision, and the majority's artificial fracturing of what is a continuum not just of time but also of business relationship cannot alter that fact.[1]

The *Spray-Rite* test is an extremely rigorous one and has been the subject of much criticism, perhaps justified. But as long as it is the law it must be applied. In my view, its application here requires that the grant of summary judgment on the Sherman Act § 1 Buick franchise claims be affirmed.

## II. *AUTOMOBILE DEALERS' DAY IN COURT ACT CLAIM (GMC Truck Delivery)*

The majority correctly notes that in the absence of facts indicating a breach of the "good faith" duty imposed by the Automobile Dealers' Day in Court Act (ADDCA), the district court may properly grant summary judgment for defendant. Majority at 577. *Accord Fray Chevrolet Sales, Inc. v. General Motors Corp.,* 536 F.2d 683, 685 (6th Cir.1976); *Salco Corp. v. General Motors Corp.,* 517 F.2d 567, 573 (10th Cir. 1975); *Berry Brothers Buick, Inc. v. General Motors Corp.,* 257 F.Supp. 542, 546

---

**1.** The fact that GMC continued to talk with Arnold and provided him with Buick order forms cannot possibly be grounds for a different conclusion. Those actions gave rise to no reasonable expectation of anything, as the majority makes clear in disposing of the contract claim. *See* majority at 572–73.

(E.D.Pa.1966), *aff'd*, 377 F.2d 552, 546 (3d Cir.1967). The majority also acknowledges that Arnold Pontiac has neither alleged nor offered evidence to suggest that General Motors' dealings with Arnold Pontiac amounted to or were accompanied by "coercion or intimidation", a requisite element of a breach of good faith as defined by the ADDCA. Majority at 577. Nevertheless, the majority reverses the district court's grant of summary judgment on one of Arnold Pontiac's ADDCA claims on the grounds that Arnold Pontiac has not had a full opportunity to elicit facts in support of its allegations of unfair or discriminatory deliveries of GMC Trucks. I disagree with this reversal, for I believe that Arnold Pontiac has failed even to allege facts that, if proven true, would support its ADDCA claim. I believe, therefore, that the district court's grant of summary judgment was proper and must be affirmed.

The AADCA, 15 U.S.C. §§ 1221–25 (1982), requires automobile manufacturers to deal in "good faith" with their dealers and defines "good faith" as "the duty of each party to any franchise, ... to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party...." 15 U.S.C. § 1221(e). The Act does not protect dealers against all unfair practices, but only against those "evidenced by acts of coercion or intimidation." *Salco Corp. v. General Motors Corp.*, 517 F.2d at 573. The caselaw plainly requires actual coercion or intimidation as an element of an AADCA claim. *Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1038 (5th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981). Consequently, it is well established that the duty of "good faith" dealing imposed by the Act must be given a narrow, rather than expansive, construction. *Autohaus Brugger Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 911 (9th Cir.), *cert. denied*, 436 U.S. 946, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978); *Milos v. Ford Motor Co.*, 317 F.2d 712, 715–16 (3d Cir.), *cert. denied*, 375 U.S.

896, 84 S.Ct. 172, 11 L.Ed.2d 125 (1963). Assessing the elements of a claim under § 1221(e), for example, the Ninth Circuit noted that

> [t]here is no question that the failure to exercise good faith within the meaning of the Act has a limited and restricted meaning. It is not to be construed liberally.... It does not mean "good faith" in a hazy or general way, nor does it mean unfairness. The existence or nonexistence of "good faith" must be determined in the context of actual or threatened coercion or intimidation.

*Autohaus Brugger v. Saab Motors, Inc.*, 567 F.2d at 911 (citations omitted).

The majority's suggestions that additional discovery concerning General Motor's deliveries of GMC trucks might produce sufficient facts to support a cognizable claim of "coercion" improperly relies on an expansive construction of § 1221(e). The Act expressly exempts "recommendation, endorsement, exposition, persuasion, urging or argument" from its prohibitions, 15 U.S.C. § 1221(e); instead, coercion or intimidation under the Act "must include a wrongful demand which will result in sanctions if not complied with." *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d at 911; *see also H.C. Blackwell Co., Inc. v. Kenworth Truck Co.*, 620 F.2d 104, 106–07 (5th Cir.1980); *Rea v. Ford Motor Company*, 497 F.2d 577, 585 (3d Cir.), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974). Evidence of arbitrary conduct, or even of conduct which in other contexts would constitute "bad faith," will not support a claim for recovery under the ADDCA absent evidence of a wrongful demand backed by a threat of sanctions. *Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d at 1039; *H.C. Blackwell Company, Inc. v. Kenworth Truck Co.*, 620 F.2d at 107.

Arnold Pontiac has not alleged that General Motors' "discrimination" in the delivery of GMC Trucks was ever accompanied by any "demand"—wrongful or otherwise. Nor has Arnold Pontiac alleged that General Motors' "discrimination" in the delivery

of trucks constituted a "sanction" for failure to accede to some wrongful demand. Most importantly for this appeal, the course of discovery which Arnold Pontiac contends was improperly curtailed by summary judgment did not concern these elements of "wrongful demand" or "sanction". Thus, even if Arnold Pontiac had been allowed to proceed with discovery and had established its allegations concerning General Motors' delivery of GMC Trucks, it still would not have advanced a claim cognizable under the ADDCA.

The majority's suggestion that additional discovery concerning General Motors' deliveries of GMC Trucks might produce sufficient facts to support a cognizable claim of coercion is unfounded. The legal insufficiency of Arnold Pontiac's claim of discriminatory truck deliveries is particularly well established. Because "there is no statutory right or formula for allocation or delivery of certain cars," *Sink v. Ford Motor Co.*, 549 F.Supp. 245, 248 (E.D.Mich.1982), the mere misallocation of vehicles is not actionable under the Act. *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 445 n. 28 (9th Cir.1979); *Southern Rambler Sales, Inc. v. American Motors Corp.*, 375 F.2d 932, 935 (D.C.Cir.), *cert. denied*, 389 U.S. 832, 88 S.Ct. 105, 19 L.Ed.2d 92 (1967); *Cecil Corley Motor Co. v. General Motors Corp.*, 380 F.Supp. 819, 844–48 (M.D.Tenn.1974). In sum, the coercion argument that the majority discerns in Arnold Pontiac's brief and oral argument is simply not sufficient to state a claim under the Automobile Dealers' Day in Court Act.[2]

Arnold Pontiac argues that the district court's July 24, 1985 order denying its request for the production of order forms signed by individual dealers in the Pittsburgh GMC Zone "effectively terminated" its discrimination delivery claim under the ADDCA. Because it is clear that even if the documents Arnold Pontiac requested had been produced, the information derived therefrom could not have established Arnold Pontiac's claims, the district court did not err by granting General Motors' motion

---

**2.** The only reported case recognizing a cause of action based on a similar theory is *Zarbock v. Chrysler Corporation*, 235 F.Supp. 130 (D.Colo. 1964). The *Zarbock* court, *in dicta*, stated that [t]hreats and coercion may be subtle. But the cases clearly establish that the burden of proving bad faith is a high one under the Act. Each detrimental action taken by the manufacturer against the dealer should be considered in assessing bad faith. It seems, however, that the sum total of actions must fit together into some consistent pattern which may be construed as outright, or implied, coercion or intimidation.

. . . . .

There seems no question that if plaintiff were singled out for repeated, excessive, and unexplainable delayed shipments, he might possibly sustain a cause of action under the Act.

*Id.* at 133–34. The *Zarbock* court held, however, that the evidence of numerous delays in the defendant manufacturer's delivery of automobiles did not establish the requisite coercion or intimidation for recovery under the Act. *Id.* at 134.

The majority's reliance on *David R. McGeorge Car Co., Inc. v. Leyland Motor Sales, Inc.*, 504 F.2d 52 (4th Cir.1974), is misplaced. *See* majority at 576. The *McGeorge* court held that a distributor's "short" allocation of Triumph automobiles constituted "bad faith dealing for purposes of the Act." *Id.* at 56. *McGeorge*, however, does not support the majority's proposition that the *mere* misallocations of automobiles in the absence of a wrongful demand or threat of sanction can provide a basis for recovery under the FDCA.

These requisite elements of "coercion" were clearly and actually present in *McGeorge*. There, the defendant distributor provided its dealers "with a proposal that in order to continue selling Triumphs they should begin selling Rovers and Land Rovers." *Id.* at 54. When the plaintiff dealers refused to stock the additional automobile lines, the distributor "began cutting [the dealer's] supply of Triumphs in an attempt to persuade it to reconsider the Rover and Land Rover proposal." *Id.* Thus, the discriminatory allocation of automobiles in *McGeorge* was cognizable under the Act because it constituted a sanction imposed by the distributor in response to the dealer's failure to accede to a wrongful demand.

Finally, the majority's difficulty in determining whether summary judgment was proper in the absence of a statement of reasons by the district court does not compel remand of this case. In reviewing the disposition of a motion for summary judgment, the appellate court reviews the same record as the district court and is required to apply the same test that should have been used initially by the district court under Fed.R. Civ.P. 56(c). *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

for summary judgment before granting Arnold Pontiac's discovery motion. One of the purposes of summary disposition is to protect litigants against expensive and time-consuming discovery in pursuit of meritless claims. *Lupia v. Stella D'Oro Biscuit Company, Inc.,* 586 F.2d 1163, 1167 (7th Cir.1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979); *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 457 (3d Cir.1977) (Aldisert, J., dissenting), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). Although in reviewing a grant of summary judgment an appellate court is "required to respect all inferences that reasonably can be drawn from the facts, ... [it] cannot ignore uncontested facts that render inferences unreasonable, or ... fantastic." *Raskiewicz v. Town of New Boston,* 754 F.2d 38, 45 (1st Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 135, 88 L.Ed.2d 111 (1985). Thus there was no abuse of discretion in the district court's denial of further discovery and no error in its entry of summary judgment for General Motors in light of the "facial insubstantiality" of Arnold Pontiac's claims. *Id.* n. 7. *See also Fowkes v. Dravo Corp.,* 7 F.R.D. 291 (E.D.Pa.1947) (a district court may deny motion to compel further deposition testimony when the court determines that the questions are irrelevant).

## III. *CONCLUSION*

For the foregoing reasons, I would affirm the district court's orders granting summary judgment on the Sherman Act § 1 claim and the Automobile Dealer Day in Court Act claim as well as its order denying the motion to compel production of documents and answers to interrogatories.